IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GEORGE P. IRISH, et al.,

    Plaintiffs,

 v.

HARRY J. FERGUSON, et al.,

    Defendants.

CIVIL ACTION
NO. 12-0174

## OPINION

Slomsky, J.                 September 3, 2013

### TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................1

II.  BACKGROUND ................................................................................1

  A.  Causes of Action in Complaint ................................................2

  B.  Parties and Related Entities ......................................................3

    1.  Plaintiffs ............................................................................3

    2.  Lakefront Development Company, LLC ......................3

    3.  Defendants ........................................................................4

      a.  "Owner Defendants": Harry Ferguson, William Black, William Waldman, and Martin Woldow ......................................................4

      b.  "Carversville Defendants": "Owner Defendants" (Ferguson, Black, Waldman, and Woldow), and Ronald Bugaj, Christine Vehstedt, Carversville Development Company, and Carversville Group ................................................4

i

c.    "Accounting Defendants": WeiserMazars, LLP, Alan Cohen, and Benjamin Fishbein ....................................................................5

d.    Re/Max, LLC ...............................................................................5

e.    "ESSA Defendants": ESSA Bank and Trust Company, and William Lewis ........................................................................6

f.    "Meagher Defendants": Meagher Realty Group, LLC, Meagher Associates, Incorporated, Tim Meagher, Heather Meagher, Paul Meagher Sr., Paul Meagher Jr., and Matthew Meagher .................6

g.    "Anderson Defendants": G. Anderson Homes, Inc., Grace Anderson, Santos Rolon, and Tammy Lee Clause .........................7

h.    "Weichert Defendants": Weichert Realtors/Paupack Group, Inc., Thomas McColligan, Judith Rodonski, Deborah Friese, and Karen Rice ..............................................................................7

C.    Statement of Facts as Alleged In Complaint ........................................8

    1.    Origins of Lakefront Development Company, LLC ...................8

    2.    Fraud Upon Lakefront: Corporate Waste ..................................8

    3.    Agreement to Transfer the Re/Max Franchise ...........................9

    4.    Fraud Upon Blue Cross ...........................................................9

    5.    Fraud Upon Lakefront and The Internal Revenue Service: Payments for Services Not Rendered, Unauthorized Distributions, and Underreporting of Lakefront's Income and Profits ...........................................10

    6.    Fraud Upon Lakefront: Scheme To Divert Lakefront's Profits ...............11

7.    Fraud Upon Lakefront and ESSA: Loans Made For The Benefit Of Others Paid For By Lakefront ............................................................................ 11

8.    Fraud Upon Lakefront: The "1740 House" .............................................. 13

9.    Attempts to Conceal the Fraud Upon Lakefront ...................................... 13

    a.    ESSA Defendants ........................................................................ 13

    b.    Attempt to Liquidate Lakefront, Allegations Regarding Schedule K-1 Tax Form ................................................................ 13

    c.    Extortion .................................................................................... 16

    d.    Irish's Petition to Compel Inspection of Corporate Records ........ 16

10.    Fraud Upon Lakefront: Credit Card Processing Account ......................... 18

11.    Conspiracy to Disparage Irish's Name with Law Enforcement ............... 18

12.    Conspiracy to Transfer Re/Max Franchise and Destroy Irish and MIK .... 20

13.    Unauthorized Alteration of "Multiple Listing Service" Records .............. 23

14.    Lawsuits Involving Plaintiffs ................................................................. 24

15.    Franchise Litigation .............................................................................. 25

16.    Receivership Litigation .......................................................................... 26

III.    STANDARD OF REVIEW ................................................................................ 26

IV.    ANALYSIS ...................................................................................................... 28

    A.    Elements of Plaintiffs' RICO Claims .............................................................. 28

    1.    18 U.S.C. § 1962(c) .............................................................................. 29

    a.    Defendant Must Be Associated With an Enterprise ..................... 29

    b.    Defendant Must Conduct or Participate in the Conduct of the Enterprise's Affairs through a Pattern of Racketeering Activity ... 30

|   |   | c. | Defendant Must Knowingly Commit At Least Two Acts of Racketeering Activity .................................................................... 30 |
|   |   | d. | Two Acts of Racketeering Activity Committed By a Defendant Must Be Connected By a Common Scheme, Plan, or Motive Constituting a Pattern of Racketeering Activity ............................ 31 |
|   |   | e. | The Enterprise Must Be Involved In or Affect Interstate Commerce .................................................................................. 32 |
|   | 2. | 18 U.S.C. § 1962(a) ..................................................................... 32 |
|   | 3. | 18 U.S.C. § 1962(b) ..................................................................... 33 |
|   | 4. | 18 U.S.C. § 1962(d) ..................................................................... 33 |

B. Plaintiffs Have Not Stated a Claim under RICO for Which Relief May Be Granted ........................................................................................................ 34

    1. Plaintiffs Lack RICO Standing .................................................................. 34

        a. Plaintiffs' Claims Regarding Harm to Lakefront by Carversville Defendants, Accounting Defendants, and ESSA Defendants Are Derivative in Nature and Do Not Confer Standing on Plaintiffs...35

        b. Plaintiffs Have No Standing to Recover Damages for Harm to Blue Cross, the Internal Revenue Service, or ESSA.............................. 40

    2. Plaintiffs' Claims Involving the Re/Max Franchise Are Barred By Collateral Estoppel ................................................................................. 41

    3. Plaintiffs Have Not Established That Carversville Defendants or Accounting Defendants Have Committed a Predicate Act With Regard To the Schedule K-1 Forms ............................................................................ 49

4. All RICO Counts Will Be Dismissed .........................................................57

C. Plaintiffs Have Not Stated a Claim under the Sherman Act for Which Relief May

Be Granted ...........................................................................................................58

1. Count Nineteen: Plaintiffs Lack Antitrust Standing Because They Have

Not Established an Antitrust Injury ..........................................................58

a. The Attempted Transfer and Cancelation of the Re/Max Franchise

Did Not Have a "Competition-Reducing" Effect on the

Marketplace ...................................................................................60

b. Weichert Defendants and Meagher Defendants Do Not Have

Market Power ................................................................................61

c. Plaintiffs Have Not Established an Antitrust Injury Because They

Only Allege Harm to Themselves, Not To Market Competition...63

2. Count Twenty: Plaintiffs Have Not Alleged Anticompetitive Conduct....65

a. There is No Per Se Liability Because Defendants Named in Count

Twenty Do Not Have Market Power .............................................66

b. Plaintiffs' Allegations in the Complaint Contradict Their Claims of

an Illegal Boycott and Anticompetitive Conduct ..........................67

D. The Court Will Decline to Exercise Supplemental Jurisdiction over the

Pennsylvania Common Law Claims....................................................................68

V. CONCLUSION ...............................................................................................................68

Appendix I: Defendants By Group ............................................................................................70

Appendix II: Defendants By Count............................................................................................71

# I.     INTRODUCTION

Plaintiff George Irish, a real estate agent in the Lake Wallenpaupack region of Northeast Pennsylvania, filed this lawsuit alleging a plethora of legal claims against thirty-two defendants, who include his former business partners, other real estate agents, attorneys, accountants, and a bank, among others. The Complaint is lengthy — ninety-six pages containing 520 paragraphs with a four-page table of contents — and describes what is alleged to be a narrative of conspiratorial and deceitful misdeeds. Irish and his co-Plaintiff, MIK, Inc., accuse the thirty-two defendants of engaging in a widespread scheme of criminal and tortious efforts to steal their assets, keep them in the dark about illicit activities, and render them unable to compete in the regional real estate market.

The claims brought by Plaintiffs fall into three categories. Nearly all Defendants are accused of committing substantive and conspiratorial criminal acts in violation of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"). Plaintiffs also allege certain Defendants unlawfully restrained commerce in violation of the Sherman Antitrust Act of 1890 ("Sherman Act"). Finally, Plaintiffs assert various Pennsylvania common law tort claims against certain Defendants.

These are serious allegations. Despite its length, however, the Complaint fails to adequately allege facts to support the federal RICO and antitrust claims. Consequently, all federal causes of action will be dismissed, and the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

# II.    BACKGROUND

The Complaint tests the limits of Federal Rule of Civil Procedure 8(a)(2), which requires that a pleading contain a "short and plain statement of the claim showing that the pleader is

entitled to relief."[1] The Complaint describes the parties and their relationship to each other on pages two to ten. Pages ten through sixty-five contain the factual allegations, a sprawling tale of alleged fraud, subterfuge, backstabbing, and misdirection. Pages sixty-five through sixty-nine contain "general RICO allegations." Pages seventy through ninety-one describe in twenty-four counts the claims made against the thirty-two Defendants. Page ninety-two sets forth a jury demand, and pages ninety-three through ninety-six are the table of contents.

## A.    Causes of Action in Complaint

The Complaint alleges violations in twenty-four counts. They are as follows:

- Violations of federal law (Counts One through Twenty)
  - o    Prohibited activity in violation of RICO
    - ▪    18 U.S.C. § 1962(a) (Count One)
    - ▪    18 U.S.C. § 1962(b) (Count Two)
    - ▪    18 U.S.C. § 1962(c) (Counts Three, Five, Seven, Nine, Eleven, Thirteen, Fifteen, and Seventeen)
    - ▪    18 U.S.C. § 1962(d) (Counts Four, Six, Eight, Ten, Twelve, Fourteen, Sixteen, and Eighteen)
  - o    Prohibited activity in violation of the Sherman Act
    - ▪    Conspiracy to Violate the Sherman Act, 15 U.S.C. § 1 (Count Nineteen)
    - ▪    Illegal Boycott in Violation of the Sherman Act, 15 U.S.C. § 1 (Count Twenty)

---

[1] Although the Complaint alleges complex causes of action, "Rule 8's pleading standard applies with the same degree of rigor 'in every case, regardless of its size, complexity, or the numbers of parties that may be involved.'" W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1221 (3d ed. 2004)).

- Violations of Pennsylvania common law (Counts Twenty-One through Twenty-Four)
  - Breach of the Covenant of Good Faith and Fair Dealing (Count Twenty-One)
  - Commercial Disparagement (Count Twenty-Two)
  - Civil Conspiracy (Count Twenty-Three)
  - Negligent Infliction of Emotional Distress (Count Twenty-Four)

**B.    Parties and Related Entities**

**1.    Plaintiffs**

Plaintiff George Irish is a Pennsylvania real estate agent. (Doc. No. 1 at 2.) Plaintiff MIK, Inc. ("MIK") is a Pennsylvania corporation. (Id.) Irish has been a shareholder of MIK since 1998. (Id.) MIK formerly did business as Re/Max of Lake Wallenpaupack-North. (Id.) MIK owned the Re/Max Franchise from 1998 to 2005. (Id.) On February 1, 2005, MIK transferred the Re/Max franchise to a partnership operated by Defendants William Waldman and William Black. (Id. at 2–3.) Plaintiffs continued to operate as real estate agents under the Re/Max Franchise until it was terminated in November 2010. (Id. at 2.) George Irish and MIK together will be referred to in this Opinion as "Plaintiffs."[2]

**2.    Lakefront Development Company, LLC**

Although not a party to this action, Lakefront Development Company, LLC ("Lakefront"), plays a central role in the dispute. Lakefront is a Pennsylvania limited liability company established on October 7, 2002. (Doc. No. 1 at 10.) The company engaged in home construction. (Id. at 12.) The members of Lakefront are Plaintiff Irish and Defendants Harry

---

[2] Sandra Irish, the spouse of George Irish, is also a plaintiff in this case. (Doc. No. 1 at 2.) She is only named as a plaintiff in Count Twenty-Four, a state law claim for negligent infliction of emotional distress. (Id. at 90–91.) As discussed infra, Count Twenty-Four will be dismissed because the Court will decline to exercise supplemental jurisdiction over the state law claims.

Ferguson, William Black, William Waldman, and Martin Woldow.[3]  (Id. at 10.)  Lakefront was placed in receivership on January 21, 2011.  (Id. at 9.)

### 3.    Defendants

In order to categorize the large number of defendants in this case, the Complaint organizes the defendants into groups.  The thirty-two defendants and their relationship to each other are as follows[4]:

> **a.    "Owner Defendants": Harry Ferguson, William Black, William Waldman, and Martin Woldow**

Defendants Ferguson, Black, Waldman, and Woldow ( "Owner Defendants") are members of Lakefront, along with Irish.  (Doc. No. 1 at 8.)  The Owner Defendants are also the sole members of Defendant Carversville Development Company, LLC and Defendant Carversville Group, LLC.  (Id.)  Irish is not a member of these two companies.  (Id.)

> **b.    "Carversville Defendants": "Owner Defendants" (Ferguson, Black, Waldman, and Woldow), and Ronald Bugaj, Christine Vehstedt, Carversville Development Company, and Carversville Group**

As stated above, Carversville Development Company and Carversville Group are companies owned by Owner Defendants.  (Doc. No. 1 at 8.)  Christine Vehstedt was an employee of Lakefront until it was placed in receivership.  (Id. at 9.)  Ronald Bugaj, Esquire, is a Pennsylvania attorney who has represented Lakefront, Owner Defendants, Vehstedt, and a

---

[3] A "member" of an LLC is "[a] person who has been admitted to membership in a limited liability company and who has not dissociated from the company."  15 Pa. Cons. Stat. § 8903(a).  The committee commentary on this statute notes:  "This definition is intended to make clear that a member has all of the rights incident to ownership, not merely the economic rights."  In effect, with regard to an LLC, the words "member" and "owner" appear to be synonymous.

[4] The table located in Appendix I attached to this Opinion describes the defendants in this action and the "defendant group" with which they are associated.  See infra App. I.  The table located in Appendix II organizes Defendants by the counts in which they are named.  See infra App. II.

general partnership known as "Waldman and Black" ("Waldman and Black GP").[5] The Complaint alleges Carversville Defendants are liable under Counts One, Two, Three, and Four (RICO, 18 U.S.C. § 1962(a)–(d)), Counts Nineteen and Twenty (Sherman Act), Count Twenty-One (Breach of Covenant of Good Faith and Fair Dealing), Count Twenty-Two (Commercial Disparagement), Count Twenty-Three (Civil Conspiracy), and Count Twenty-Four (Negligent Infliction of Emotional Distress).

### c. "Accounting Defendants": WeiserMazars, LLP, Alan Cohen, and Benjamin Fishbein

Alan Cohen and Benjamin Fishbein are certified public accountants. (Doc. No. 1 at 4.) Benjamin Fishbein is now retired. (Id.) Both defendants formerly worked for an accounting firm known as Fishbein and Company, P.C., which is not a defendant in this case. Alan Cohen now works for the accounting firm WeiserMazars, LLP, which is a defendant in this case. (Id.) The Complaint alleges Accounting Defendants are liable under Counts Five and Six (RICO, 18 U.S.C. § 1962(c)–(d)).

### d. Re/Max, LLC

Re/Max, LLC is a Delaware corporation. (Doc. No. 1 at 4.) The Complaint alleges Re/Max, LLC is liable under Counts Seven and Eight (RICO, 18 U.S.C. § 1962(c)–(d)).

---

[5] The Court will add the designation "GP" to "Waldman and Black GP" in order to differentiate it from individual Defendants William Waldman and William Black. Waldman and Black GP is not listed as a Carversville Defendant in the Complaint. (Doc. No. 1 at 3.) Waldman and Black GP is alleged to be liable under Counts Nineteen, Twenty-Two, Twenty-Three, and Twenty-Four. The Complaint seems to infer that Waldman and Black GP may not exist as a legal entity. (See id. at 38.)

Bugaj and Fischer, P.C. is also named as a defendant in this case, but is not listed as a Carversville Defendant in the Complaint. (Id. at 3–4.) Bugaj and Fischer, P.C. is a law firm that is partly owned by Defendant Ronald Bugaj. (Id.) Bugaj and Fischer, P.C. is alleged to be liable under Counts Nineteen, Twenty-Two, Twenty-Three, and Twenty-Four.

### e. "ESSA Defendants": ESSA Bank and Trust Company, and William Lewis

ESSA Bank and Trust ("ESSA") is a Pennsylvania financial institution. (Doc. No. 1 at 4.) William Lewis is a vice-president of commercial lending at ESSA. (Id. at 5.) ESSA made three loans relevant to this lawsuit: (1) a March 16, 2005 loan in the amount of $2 million to Carversville Group (id. at 21); (2) a May 23, 2005 loan in the amount of $500,000 to Carversville Development Company (id.); and (3) an April 19, 2006 loan in the amount of $2.25 million to Carversville Group which was used to pay off the two earlier loans (id. at 22). The Complaint alleges ESSA Defendants are liable under Counts Nine, Ten, Eleven, and Twelve (RICO, 18 U.S.C. § 1962(c)–(d)).

### f. "Meagher Defendants": Meagher Realty Group, LLC, Meagher Associates, Incorporated, Tim Meagher, Heather Meagher, Paul Meagher Sr., Paul Meagher Jr., and Matthew Meagher

Paul Meagher Sr. is the father of Tim Meagher, Paul Meagher Jr., and Matthew Meagher. (Doc. No. 1 at 9.) Heather Meagher is the spouse of Tim Meagher. (Id.) Meagher Realty Group, LLC, operates under the business name "Re/Max BEST." (Id. at 5.) Meagher Associates, Incorporated, operates under the business name "Re/Max WAYNE." (Id.) Tim Meagher is a real estate broker and owner of the Re/Max BEST and Re/Max WAYNE franchises. (Id. at 5.) The Complaint alleges Meagher Defendants are liable under Counts Thirteen and Fourteen (RICO, 18 U.S.C. § 1962(c)–(d)), Count Nineteen (Conspiracy to violate the Sherman Act), Count Twenty-Two (Commercial Disparagement), and Count Twenty-Three (Civil Conspiracy). Meagher Defendants, except for Paul Meagher Jr. and Matthew Meagher, are also alleged to be liable under Count Twenty (Illegal Boycott in Violation of the Sherman Act).

### g. "Anderson Defendants": G. Anderson Homes, Inc., Grace Anderson, Santos Rolon, and Tammy Lee Clause

G. Anderson Homes, Inc., is a Pennsylvania corporation. (Doc. No. 1 at 6.) Grace Anderson is a shareholder and president of G. Anderson Homes. (Id.) Santos Rolon is a Pennsylvania real estate salesperson and the spouse of Grace Anderson.[6] (Id.) Tammy Lee Clause, Esquire, is a Pennsylvania attorney. (Id. at 7.) Anderson Defendants are alleged to be liable under Counts Fifteen and Sixteen (RICO, 18 U.S.C. § 1962(c)–(d)), Count Nineteen (Conspiracy to Violate the Sherman Act), Count Twenty-Two (Commercial Disparagement), and Count Twenty-Three (Civil Conspiracy).

### h. "Weichert Defendants": Weichert Realtors/Paupack Group, Inc., Thomas McColligan, Judith Rodonski, Deborah Friese, and Karen Rice

Weichert Realtors/Paupack Group, Inc. ("Weichert") is a Pennsylvania corporation. (Doc. No. 1 at 7.) Thomas McColligan and Judith Rodonski are Pennsylvania real estate brokers and shareholders of Weichert. (Id.) Deborah Friese is a real estate broker associated with Weichert, and Karen Rice is a real estate salesperson associated with Weichert. (Id. at 7–8.) The Complaint alleges Weichert Defendants are liable under Counts Seventeen and Eighteen (RICO, 18 U.S.C. § 1962(c)–(d)), Count Nineteen (Conspiracy to Violate the Sherman Act), Count Twenty (Illegal Boycott in Violation of the Sherman Act), Count Twenty-Two (Commercial Disparagement), and Count Twenty-Three (Civil Conspiracy).

---

[6] Santos Rolon is employed by Defendant Weichert Realtors/Paupack Group. (Doc. No. 1 at 7.)

## C.   Statement of Facts as Alleged In Complaint[7]

### 1.   Origins of Lakefront Development Company, LLC

On October 7, 2002, Irish and Owner Defendants created Lakefront Development Company, LLC. (Doc. No. 1 at 10.) Each member of the LLC was required under Lakefront's Operating Agreement to deposit $15,000 into Lakefront's operating account. (Id.) Irish is the only member who made such a deposit. (Id. at 11.)

Owner Defendants did not disclose to Irish that they had an ownership interest in Carversville Development Company and Carversville Group. (Id.) At the time of Lakefront's creation, Carversville Development Company owned a property in Bucks County, Pennsylvania, known as the "1740 House." (Id.) From 2005 to 2009, Lakefront was one of the top-five home construction companies in the Pike/Wayne real estate market in northeastern Pennsylvania. (Id. at 12.) Plaintiffs allege that after the creation of Lakefront, Owner Defendants participated in a scheme to defraud Plaintiffs and benefit themselves and their companies, Carversville Development Company and Carversville Group. (Id.)

### 2.   Fraud Upon Lakefront:  Corporate Waste

On or about November 1, 2002, Ferguson purchased from Lakefront real estate worth $650,000. (Id.) The purchase price was $360,000. (Id.) This transaction caused a loss of $290,000 to Lakefront. (Id.) Ferguson also purchased materials to build his personal home using the funds of Lakefront.[8] (Id. at 13.)

---

[7] The following facts are set forth in the Complaint. The Court considers these facts in the light most favorable to Plaintiffs. All "well-pleaded" facts will be considered by the Court as true. Facts that are conclusory in nature, however, are not entitled to an assumption of truth. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).

[8] The Complaint does not state when these activities allegedly took place. Based on the order of paragraphs in the Complaint, the Court will infer these activities took place between 2002 and 2005.

### 3. Agreement to Transfer the Re/Max Franchise

On February 1, 2005, Waldman and Black GP entered into what Plaintiffs characterize as an "accommodation agreement"[9] with MIK regarding the Re/Max Franchise previously owned by MIK (the "Re/Max Franchise"). (Id.) At the time of the transfer, MIK had been operating under the Re/Max Franchise for seven years, had annual real estate sales of $55 million, and Irish's ranking within the Pike/Wayne Association of Realtors was within the top ten out of 500 members. (Id. at 14.) The Complaint alleges that the "accommodation agreement" was created "as a way to insure [sic] that their fraud would not be discovered, to insure [sic] that they could continue their fraud, and that they could further control the victims of their fraud." (Id. at 14–15.)

### 4. Fraud Upon Blue Cross

Sometime in or before February 2007, Lakefront began paying monthly health insurance premiums to Blue Cross of Northeastern Pennsylvania ("Blue Cross") for two individuals: Defendant Christine Vehstedt and Joyce Cooke. (Id. at 15.) Although Vehstedt was employed by

---

[9] On February 1, 2005, the Re/Max franchise previously owned by MIK was transferred to Waldman and Black GP. Simultaneously, Waldman and Black GP executed a Re/Max Franchise Agreement with Re/Max. Plaintiffs operated under this franchise as employees or independent contractors until November 2010, when Re/Max terminated the franchise.

On August 25, 2010, Plaintiffs filed a lawsuit in the Court of Common Pleas of Pike County, Pennsylvania, seeking a preliminary injunction to prevent the termination of the Re/Max Franchise. On November 1, 2010, the state court held that Plaintiffs were not owners of the Re/Max Franchise after February 1, 2005. The state court also found that, despite Plaintiffs' argument that Waldman and Black GP was a mere "straw party," the "clear and unambiguous wording" of the contract did not support Plaintiffs' argument. The court held that Plaintiffs' "straw party" argument "challenges the validity of the contract itself," and "[t]hat type of claim must be submitted to arbitration under Paragraph 15 of the Agreement."

Despite these rulings, Plaintiffs continue to refer to Waldman and Black GP as a "straw party" (see Doc. No. 1 at 37, 38, 39, 40, 45, 60), and characterize the February 1, 2005 agreement not as an agreement which terminated Plaintiffs' ownership of the Franchise, but as "an accommodation to Plaintiff Irish." (Doc. No. 1 at 13; see infra Section (IV)(B)(2).)

Lakefront, Joyce Cooke was not. (Id.) Vehstedt, however, represented in a facsimile sent to Blue Cross that "Carversville is the holding company for Lakefront," and that Cooke "does work for both companies." (Id.) Cooke was the full-time "innkeeper" at the "1740 House," in which Lakefront had no business interest. (Id.) No entity named "Carversville" was a holding company for Lakefront. (Id. at 16.) On March 24, 2007, Vehstedt sent a "new Enrollment Application for the Blue Care Traditional Plan" to Blue Cross on behalf of Cooke. (Id.)

In January 2009, Blue Cross conducted a random audit of Lakefront. (Id.) After the audit, Blue Cross canceled the health insurance policy due to fraud, because Cooke was an ineligible person on the policy. (Id.) The Complaint alleges Owner Defendants and Vehstedt had actual knowledge of this fraud upon Blue Cross, which was achieved without notice to Irish. (Id.)

### 5. Fraud Upon Lakefront and The Internal Revenue Service: Payments for Services Not Rendered, Unauthorized Distributions, and Underreporting of Lakefront's Income and Profits

Ferguson and Black received checks from Lakefront for services they did not perform. (Id. at 17.) Ferguson, Black, and Vehstedt also received free gasoline for their personal use, which was paid for by Lakefront.[10] (Id.) Ferguson's assistant, Theodore Hemke, also received payments from Lakefront that he did not earn, personal use of a truck and tools owned by Lakefront, and gasoline paid for by Lakefront. (Id. at 17–18.) Owner Defendants also made distributions to themselves from the assets of Lakefront. (Id. at 18.) Irish had no notice of the payments and benefits given to Hemke and Owner Defendants by Lakefront. (Id.)

---

[10] The Complaint does not specify the time frame in which these checks were received or when the gasoline was paid for.

Owner Defendants and Vehstedt created and altered records in order to underreport Lakefront's income, expenses, and profits. (Id. at 19.) This underreporting resulted in inaccurate tax returns filed with the Internal Revenue Service ("IRS"). (Id.)

### 6. Fraud Upon Lakefront: Scheme To Divert Lakefront's Profits

Over the course of several years, Carversville Defendants engaged in a scheme to divert the assets of Lakefront and hide the diversion with the assistance of Accounting Defendants. (Id.) Under the scheme, unimproved land would be purchased by Lakefront, and a residence would be constructed on the land using Lakefront's money. (Id.) At or near the time the construction of the residence was completed, the improved land would be transferred to a person or entity controlled by one or more of the Carversville Defendants for less than the cost incurred by Lakefront and for less than the market value of the property. (Id.) The purchasing entity would then sell the property for a profit. (Id. at 20.) In effect, Lakefront incurred all the costs of acquiring and improving the land, but received little or no profits. (Id.) Carversville Defendants hid this scheme from Irish and the IRS. (Id.)

### 7. Fraud Upon Lakefront and ESSA: Loans Made For The Benefit Of Others Paid For By Lakefront

Lakefront also made payments on loans for the benefit of others, without notice to Irish. (Id.) Lakefront received one or more loans from Invest National Bank and Trust Company. (Id.) The amount owed on one such loan was $1.8 million.[11] (Id. at 21.)

Carversville Group and Carversville Development Company also entered into several loan transactions with ESSA.[12] William Lewis was the banking official on these loans. (Id.) On

---

[11] The Complaint does not explain how this loan from Invest National Bank and Trust was improper or harmed Lakefront.

[12] ESSA is a regional bank. It is an acronym for East Strausburg Savings Association. See ESSA Bank & Trust — About Us, https://www.essabank.com/html/essa_history.html.

March 16, 2005, Carversville Group borrowed $2 million from ESSA. (Id.) The billing address used by Carversville Group was Lakefront's address at the time: HC6, Box 6103, Hawley, PA 18428. (Id.) This address was also the address of the residence of Defendant Woldow. (Id.)

On May 23, 2005, Carversville Development Company borrowed $500,000 from ESSA. (Id.) The billing address was Lakefront's Hawley, Pennsylvania office address. (Id.) On April 10, 2006, Vehstedt sent a letter on Lakefront's letterhead to ESSA and included interest checks covering interest due on these two loans. (Id. at 22.) On April 19, 2006, Carversville Group executed a promissory note and borrowed $2.25 million from ESSA. (Id.) The purpose of the loan was to pay off the $2 million and $500,000 loans from ESSA. (Id.) Payments on this loan were also made by Lakefront. (Id.)

The Complaint describes the nature of ESSA's involvement in this alleged scheme as follows:

> The methods by which the Carversville Defendants could and would dupe ESSA and [William] Lewis, or pretend to dupe them, and by which ESSA and Lewis could pretend to be duped, were as follows:
>
> a) Certain of the Owner Defendants and Vehstedt would supply or appear to supply so much valuable and liquid collateral that the lender, ESSA, and its banking officers, including Lewis, did not engage in the checks and balances normally practiced by lenders for loans of amounts in excess of $2,000,000.
>
> b) Certain of the Carversville Defendants would lead ESSA and Lewis to believe that the proceeds of the loans were for the benefit of [Lakefront] (when they were not.)
>
> c) Certain of the Carversville Defendants would lead ESSA and Lewis to believe that one of the Carversville Defendants was the "holding company" of [Lakefront].
>
> d) The beliefs (or purported beliefs) that the funds were for the benefit of [Lakefront] and/or that a company named "Carversville" was a holding company of [Lakefront] would allow ESSA and Lewis to ignore the fact that payments were being made by [Lakefront] on loans which [Lakefront] was not liable and which did not benefit [Lakefront].

e) ESSA had no [Lakefront] corporate document authorizing payment from [Lakefront] on loans on which it was not liable and on which it had not received the proceeds.

f) ESSA had no [Lakefront] corporate document authorizing [Lakefront] to become liable on loans made to Carversville Group or Carversville DC.

(Id. at 24 (emphasis in original).)

### 8. Fraud Upon Lakefront: The "1740 House"

Owner Defendants and Vehstedt used at least $925,000 of Lakefront's money to maintain and renovate a property known as the "1740 House." (Id. at 25.) The "1740 House" was owned by Carversville Development Company. (Id.) When the "1740 House" was sold on November 30, 2010 for $1.225 million, Carversville Development Company did not reimburse Lakefront for any funds used to maintain and renovate the property. (Id.)

### 9. Attempts to Conceal the Fraud Upon Lakefront

#### a. ESSA Defendants

On November 4, 2009, Irish contacted ESSA and inquired about loan payments to ESSA from Lakefront. (Id. at 26.) William Lewis attempted to redirect Irish to Ferguson and Waldman, and described "Carversville" and "Lakefront" as the same company. (Id.) The Complaint alleges that ESSA and Lewis had actual knowledge that the loans made to Carversville Development Company and Carversville Group were improperly paid for by Lakefront, and tried to hide the illicit activities from Irish.[13] (Id.)

#### b. Attempt to Liquidate Lakefront, Allegations Regarding Schedule K-1 Tax Form

On October 29, 2008, Ronald Bugaj, Esquire, sent a letter to Irish regarding the liquidation of Lakefront. (Id.) In the Complaint, Plaintiffs contend that the purpose of the

---

[13] This allegation contradicts the theory that Carversville Defendants defrauded the ESSA Defendants in order to obtain loans. See supra Section (II)(C)(7).

liquidation was to conceal the illegal conduct of Carversville Defendants from Irish and the government. (Id.) On November 18, 2008, former counsel for Irish, John F. Spall, Esquire, responded to the letter sent by Bugaj. (Id. at 27.) In the letter, Spall requested information regarding: (1) money expected to be paid to Lakefront; (2) daily business operations of Lakefront; (3) protection of Lakefront's corporate assets; and (4) protection of Lakefront's corporate books and records. (Id.)

On December 10, 2008, Spall and Bugaj held a meeting regarding the liquidation of Lakefront (the "December 10 Meeting"). (Id.) On December 11, 2008, Bugaj wrote to Spall to confirm the discussions held during the December 10 Meeting. (Id.) In the letter, Bugaj represented that Irish would receive access to corporate records and documents regarding Lakefront's outstanding debt. (Id.) On December 13, 2008, Irish hired a forensic accountant.[14] (Id.)

On December 20, 2008, Irish wrote to Vehstedt inquiring about the Schedule K-1 tax form[15] Lakefront gave to Irish. (Id. at 28.) Irish did not receive the documents he requested. (Id.) On December 23, 2008, Vehstedt responded to Irish's letter by e-mail, advising him that questions regarding the 2007 K-1 should be addressed to accountants Fishbein and Company, P.C. (Id.) She also advised him that, per the instructions of Bugaj, "any and all concerns

---

[14] The Complaint avers: "Due to the conduct of the Carversville Defendants, by and through [Lakefront], Irish was required to engage the services of a forensic accountant . . . ." (Doc. No. 1 at 27.) This paragraph could be read to infer that Irish hired a forensic accountant because he became suspicious about the financial state of Lakefront and the actions of Carversville Defendants following the December 10 meeting. The Complaint, however, does not specifically make this allegation.

[15] A Schedule K-1 is a tax form used to report a taxpayer's portion of a corporation's income or loss which passes to the taxpayer as a shareholder of the corporation. Although not specifically alleged in the Complaint, Accounting Defendants prepared the Schedule K-1 for Irish yearly from 2002 to 2009. (See Mot. Hr'g Tr. 160:4–15; 161:7–9; 165:6–12 Nov. 6, 2012.)

regarding any aspect to [sic] Lakefront Development Co, LLC" should be directed to Bugaj. (Id.) The Complaint alleges this instruction was given to hide the illicit conduct of Carversville Defendants. (Id.)

On February 12, 2009, Spall wrote to Bugaj regarding the representations made in the December 10 Meeting, requesting an inspection of books, records, and other documents listed in the letter. (Id.) On April 3, 2009, Spall sent another letter to Bugaj complaining about the lack of response. (Id.) On April 6, 2009, Bugaj responded to Spall, promising "a response as quickly as possible," but only if Spall provided his "authority for requesting such an inspection and a specific list of the documents as to what documents [he] would like to look at." (Id. at 29.) On April 8, 2009, Spall responded, stating that he had already met Bugaj's conditions and attaching applicable portions of Lakefront's Operating Agreement and Spall's February 12, 2009 letter. (Id.)

Bugaj rejected Spall's requests on the basis that Irish had not resigned from Lakefront, and stated that if Irish wanted records, he should contact Mr. Fishbein.[16] (Id.) The Complaint alleges that as of April 8, 2009, Bugaj had actual knowledge of the "plundering" of Lakefront by Carversville Defendants.

On April 16, 2009, Spall faxed a letter to Bugaj stating that Irish had not agreed to resign from Lakefront because he had received a prior correspondence stating that Ferguson intended to resign. (Id. at 30.) On April 17, 2009, Joseph Rydzewski[17] wrote to Bugaj requesting written authorization to copy Lakefront's records in the possession of Mr. Fishbein. (Id.) On April 21,

---

[16] The Court will view the reference to "Mr. Fishbein" as a reference to Defendant Benjamin Fishbein.

[17] Although the Complaint does not identify Joseph Rydzewski, he appears to be an attorney affiliated with Spall.

2009, Bugaj responded to Rydzewski, stating that Irish "would be allowed only <u>access</u> to the records, and not <u>copying</u> of those records, <u>unless</u> Irish paid for copying." (<u>Id.</u> (emphasis in original).) Bugaj also stated that Lakefront would not compensate Mr. Fishbein for his time in providing Irish access to the books and records. (<u>Id.</u>)

### c. Extortion

On June 23, 2009, Bugaj and Waldman visited Spall and Rydzewski's offices and presented a "Stipulation and Settlement Agreement." (<u>Id.</u>) Although no civil action had been filed at the time, the Stipulation and Settlement Agreement included a caption listing Lakefront as the plaintiff and Irish as the defendant. (<u>Id.</u> at 31.) The Stipulation and Settlement Agreement asserted that Re/Max had received complaints of unethical behavior about Irish's business operations under the Re/Max franchise. (<u>Id.</u>) The Complaint alleges that Re/Max did not receive any such complaints, and that "[a]ny false complaints received by Re/max [sic] were created and passed on to ReMax by the Carversville Defendants using the mails and interstate wires." (<u>Id.</u>) On June 26, 2009, Rydzewski wrote to Bugaj, advising him that Irish considered the Stipulation and Settlement Agreement to be an extortion attempt. (<u>Id.</u> at 32.)

### d. Irish's Petition to Compel Inspection of Corporate Records

On July 1, 2009, Rydzewski requested access to Lakefront's books and records. (<u>Id.</u> at 33.) On July 7, 2009, Rydzewski wrote a letter notifying Bugaj "of the need for a full accounting[] and of the doubtful legality of the alleged loss of $370,217.60 on the 2007 K-1." (<u>Id.</u>) On August 12, 2009, Irish filed a "Petition to Compel Inspection of Corporate Records and/or Documents" in the Court of Common Pleas of Pike County, No. 1667-Civil-2009 ("the

Records Action").[18] (Id.) On August 24, 2009, Carversville Defendants filed an answer to the petition stating that Irish was on a "fishing expedition," and that "Irish had violated the law and the Operating Agreement to such an extent that he had effectively elected to withdraw from Lakefront." (Id. at 34.) The Complaint alleges that there is no basis under the Operating Agreement to assert that Irish had withdrawn, and that "[t]he purpose of causing (or purporting to cause) the 'withdrawal' of Irish, either at Irish's request or as an operation of law, was to hide the fraudulent and illegal conduct of the Carversville Defendants." (Id.)

On October 21, 2009, Irish and Lakefront entered into a stipulation. (Id.) Under the terms of the stipulation, Lakefront was obligated to produce its files and records on October 26, 2009. (Id.) In return, a hearing and depositions of Vehstedt and Waldman were postponed. (Id. at 35.) The Complaint alleges the purpose of the stipulation was for Carversville Defendants to "extend the time period during which the Carversville Defendants' conduct, as described in [the] Complaint, would be kept from Irish and government agencies, including the Internal Revenue Service." (Id.) The Complaint also alleges that Carversville Defendants "had no intention of complying with the Stipulation in the Records Action." (Id.)

Carversville Defendants did not turn over any records until October 30, 2009. (Id.) The records turned over were not the records Irish sought, and were instead "specifically selected by the Carversville Defendants." (Id.) The Complaint alleges that Carversville Defendants breached the Stipulation "to extend the period during which the Carversville Defendants' conduct, as described in [the] Complaint, would go undisclosed, thus providing the Carversville

---

[18] The Complaint does not state who were the parties to the Records Action, nor is a copy of the petition attached to the Complaint. Based on allegations in the Complaint, it appears that Carversville Defendants were named as defendants in the Records Action. (See, e.g., Doc. No. 1 at 34.)

Defendants with additional time to use their own efforts and those of others, as outlined in [the] Complaint, to destroy Irish." (Id.)

On November 1, 2009, Joseph Yanushefsky, a forensic accountant, reviewed the records produced by Lakefront on October 30, 2009. (Id. at 36.) On November 2, 2009, he prepared a report regarding the records produced and not produced by Lakefront.[19] (Id.) On November 4, 2009, Rydzewski sent a letter to Bugaj complaining about missing records, with Yanushefsky's report attached. (Id.) The Complaint alleges that Fishbein and Co., P.C., which is now Defendant WeiserMazars following a merger, along with Defendants Fishbein and Cohen, "participated in the refusal of the Carversville Defendants to turn over the books and records of [Lakefront.]" (Id.)

### 10. Fraud Upon Lakefront: Credit Card Processing Account

On or about March 1, 2009, Ferguson and Waldman opened a credit card processing account in the name of Lakefront and Waldman at Honesdale National Bank, with a credit line of $15,000. (Id. at 37.) Ferguson used the credit card processing account for his own personal benefit. (Id.) Carversville Defendants did not disclose this account to Irish. (Id.)

### 11. Conspiracy to Disparage Irish's Name with Law Enforcement

On June 4, 2009, "Waldman and Black took the affirmative step of contacting Re/Max to drop the bomb of 'fraud,' [committed by Irish and MIK], but declining to provide further clarification, supposedly at the instruction of the District Attorney of Pike County, when in fact the District Attorney made no such instruction."[20] (Id. at 40.) The Complaint alleges that "[t]he

---

[19] The Complaint states: "The Plaintiff [sic] hereby incorporates the assertions in the November 2nd Report as if set forth at length with this complaint." (Doc. No. 1 at 36.) Because the Report is not attached to the Complaint, the Court is unable to consider its content.

[20] It is unclear whether "Waldman and Black" here refers to the individual Defendants or Waldman and Black GP.

complaint and the conduct of June 4, 2009, by Waldman and Black originated only because of the request by Irish to review the books and records of [Lakefront.]" (Id.) In June 2009, Bugaj, as the attorney for Waldman, spoke to a Re/Max representative and discussed "removing Irish."[21] (Id.) While Waldman and Black were communicating with Re/Max, Ferguson and Waldman initiated meetings with the Pennsylvania State Police and the District Attorney of Pike County.[22] (Id.)

The meeting with the Pennsylvania State Police took place at the Blooming Grove State Police Barracks with State Trooper Sandra Van Luvender. (Id.) Present at the meeting was McColligan, Kayla Scott (Tim Meagher's secretary), Dave Matthews (a real estate agent associated with Re/Max Wayne), and Ferguson. (Id.) With the exception of Ferguson, all others attending the meeting were competitors of Irish. (Id.) On the same date, Tim Meagher met with Ferguson. (Id. at 41.)

A later meeting with the District Attorney of Pike County occurred at Weichert's offices in Hawley, Pennsylvania. (Id.) Present at this meeting was Pike County District Attorney Ray Tonkin, Trooper Van Luvender, Ferguson, Black, Waldman, Dave Matthews, McColligan, and

---

[21] It is unclear what "removing" means, in light of the fact that Waldman and Black GP owned the Re/Max Franchise. It may refer to terminating Plaintiffs' relationship with the franchise, or with Re/Max as the franchisor.

[22] It is unclear whether Waldman attended both the meeting with ReMax and the meeting with law enforcement.

Tim Meagher.[23] (Id.)  The Complaint alleges Black, Waldman, McColligan, and Tim Meagher

used the meeting to smear Irish's name.  (Id.)  Several other meetings were also held by these

defendants for the purpose of eliminating Plaintiffs as competitors.  (Id. at 41–42.)

### 12.    Conspiracy to Transfer Re/Max Franchise and Destroy Irish and MIK

As previously noted, on February 1, 2005, the Re/Max Franchise operated by MIK was

transferred to Waldman and Black GP.  (Id. at 37.)  After the transfer to Waldman and Black GP,

the Re/Max Franchise had a five-year term due to expire on January 31, 2010.  (Id.)  Plaintiffs

continued to operate under the Re/Max Franchise now owned by Waldman and Black GP as

employees or independent contractors.  (Id. at 38.)  Waldman and Black GP made material

misrepresentations in the documents submitted to Re/Max in 2005.[24]  (Id.)  MIK paid the fees

associated with the Re/Max Franchise.  (Id. at 39.)  Re/Max did not impose upon Waldman and

Black GP the normal training and business standards for franchisees.[25]  (Id.)

In 2009, Waldman and Black stated an intention to renew the Re/Max franchise, in

accordance with the requirements of the franchise agreement.  (Id.)  At that time, Plaintiffs were

operating the Re/Max Franchise within Re/Max's required standards and had real estate sales

exceeding $60 million per year.  (Id.)  Irish was also being honored by Re/Max for his

achievements.  (Id. at 40.)

---

[23] Plaintiffs allege that the meetings with the law enforcement officer and the Pike County District Attorney are part of the conspiracy to operate the RICO enterprise through the commission of a pattern of racketeering activity and to commit criminal acts restraining commerce in violation of the antitrust laws.  In effect, the Complaint alleges that Defendants present at the meeting committed crimes in the presence of the law enforcement officials attending the meeting.  Trooper Van Luvender and District Attorney Tonkin are not named as defendants in this lawsuit.  There is no allegation in the Complaint that any public employee or official committed any acts that assisted the alleged conspiracy.

[24] The Complaint does not allege what these material misrepresentations were, what injury they caused, or provide any other details.

[25] The Complaint does not elaborate on how this contention is relevant to the lawsuit.

Meanwhile, Waldman and Black began negotiating with Re/Max to have the Re/Max Franchise transferred to Meagher Defendants for less than its market value, and for Meagher Defendants to rent space from Lakefront for less than its fair rental value. (Id. at 42–43.) This office space is directly next door to the Irish Office Building, where Defendant Irish had his office. (Id.) The object of this plan "was to create a buyer/transferee of the ReMax Franchise, or a sham buyer/transferee, who would cause the most harm to Irish and MIK and cause the most benefit to the Carversville Defendants." (Id. at 43.)

Around September 2009, "certain Meagher Defendants" began to negotiate directly with Re/Max to acquire the Re/Max Franchise. (Id.) At this time, Plaintiffs controlled 17% of the relevant real estate sales market. (Id.) On October 9, 2009, Ferguson and Waldman met with the Meagher Defendants.[26] (Id.) On October 16, 2009, Meagher Defendants developed a business plan. (Id. at 43–44.) The Complaint alleges that Tim Meagher "intended to not only obtain a ReMax franchise next door to the Irish Office Building, but also to insure [sic] that Irish would no longer be operating under the ReMax name." (Id. at 44.) The Complaint also alleges that "Carversville Defendants would likewise benefit from a ReMax operation in the [Lakefront] Office Building as they would continue to operate [Lakefront] in the same building as the ReMax real estate office." (Id.) The Complaint alleges that Weichert also had a motive to assist the plans of Carversville Defendants and Meagher Defendants because "Weichert would rather a

---

[26] The Complaint describes the events leading to this meeting as follows: "The negotiations between Ferguson and Waldman on the one hand, and the Meagher Defendants on the other hand, proceeded to the point of a writing with terms for use at a meeting scheduled to be held — and then held — on October 9, 2009, the second of such meetings." (Doc. No. 1 at 43.)

[sic] weak ReMax operation run by the Meagher Defendants . . . than the powerful and successful ReMax operation owned by MIK and operated by Irish . . . ."[27] (Id.)

On January 13, 2010, Waldman and Black GP informed Re/Max they intended to renew the franchise for five years. (Id. at 46.) On January 25, 2010, Re/Max notified Waldman and Black GP that it would grant a six-month extension of the franchise. (Id.) The purpose of this six-month extension was a "potential transfer" of the Re/Max Franchise to Meagher Defendants, which the Complaint alleges was "to further the conspiracy against Irish and MIK." (Id. at 46–47.) The Complaint also alleges that "[n]o party to the extension intended the extension to benefit Irish or MIK in any way."[28] (Id.) Carversville Defendants falsely represented to Re/Max that the Pike County District Attorney had asked Waldman and Black to request the extension. (Id.)

In May through July 2010, a series of conference calls were held regarding the Re/Max Franchise. (Id.) On July 21, 2010, Waldman, Black, Tim Meagher, and Paul M. Meagher Jr. falsely represented to Re/Max that the District Attorney of Pike County was pursuing charges against Irish. (Id. at 48.) Re/Max did not attempt to determine the status of the purported investigation by the District Attorney until July 2010. (Id.)

On July 26, 2010, Bugaj requested an additional six-month extension of the franchise. (Id. at 49.) Re/Max denied this request. (Id.) On July 27, 2010, Harry Ferguson spoke to a representative of Re/Max, and Re/Max granted a one-month extension of the franchise "to make

---

[27] The Complaint does not explain why or how the Re/Max Franchise would be "weak" under the operation of Meagher Defendants.

[28] It is unclear what obligation or duty any party to this franchise extension was operating under requiring them to benefit Irish or MIK.

the franchise marketable."[29] (Id.) As of July 30, 2010, Re/Max was complying with Waldman's request that important correspondence not be sent to Plaintiffs' office. (Id. at 50.)

On August 23, 2010, a Re/Max representative contacted Irish by telephone, and he learned for the first time that the Re/Max Franchise would terminate on August 31, 2010. (Id.) Later that day, Tim Meagher spoke with a Re/Max representative, and later wrote a letter stating that he was "VERY interested in purchasing a franchise and operating one in the Hawley-Lake Wallenpaupack area very near to where the current one exists." (Id. (emphasis in original).)

### 13. Unauthorized Alteration of "Multiple Listing Service" Records

Irish is a member of the Pike-Wayne Association of Realtors (the "Association"). (Id. at 52.) The Association maintains a "multiple listing service" ("MLS"). (Id.) Irish subscribed to this service. (Id.) The MLS is accessible by consumers and real estate professionals, and lists properties for sale by a real estate broker. (Id.) Other realtors who subscribed to the MLS were Defendants Weichert, McColligan, Rodonski, Friese, Rice, Paul Meagher Sr., Tim Meagher, Heather Meagher, and Santos Rolon. (Id.) A broker's profile on the MLS is password-protected. (Id.)

Until August 4, 2010, Irish's listings on the MLS would direct a viewer to a website maintained by Irish and MIK: www.LakeRealtor.com. (Id. at 53.) On or about August 4, 2010, the website listed on the MLS was changed from www.LakeRealtor.com to www.poconolakehome.com, which is a website maintained by Elaine Strong, a real estate agent in Scranton, Pennsylvania.[30] (Id.) Around October 6, 2010, Irish discovered the website had been changed and reported the problem to the Association. (Id. at 53–54.) Irish later discovered

---

[29] The relationship between this extension and the extension requested in Bugaj's July 26, 2010 letter is unclear.

[30] Ms. Strong is not named as a defendant in this case.

that his MLS profile had been repeatedly accessed using a password to change the website address and to access confidential information on the profile. (Id. at 54.)

At the time of this unauthorized access, Defendant McColligan was a member of the Association's board, and both McColligan and Tim Meagher were members of the sub-committee charged with overseeing the MLS. (Id.) The Complaint alleges that "one or more of the Weichert Defendants or one or more of the Anderson Defendants participated in or benefitted from the unauthorized change in the primary web address or the unauthorized access described above." (Id.) McColligan is named as one of the "Weichert Defendants," but Tim Meagher is not named as one of the "Anderson Defendants."

### 14.   Lawsuits Involving Plaintiffs

Beginning on September 25, 2010, a series of lawsuits were filed in state court against Plaintiffs.[31] (Id. at 55.) Plaintiffs contend these lawsuits are meritless and that "[w]hile others were attempting to acquire the ReMax Franchise and to otherwise harm the Plaintiffs, other Defendants, including the Anderson Defendants, conspired with others and sought to use the burdens of meritless litigation to harm the Plaintiffs MIK and Irish." (Id.) Plaintiffs also contend that Carversville Defendants and Anderson Defendants sent pleadings and other

---

[31] The case numbers for the civil actions filed against Plaintiffs are alleged in the Complaint as follows: No. 2123-Civil-2010 (Ct. Com. Pl. Pike Cnty.); No. 2360-Civil-2010 (Ct. Com. Pl. Pike Cnty.); No. 2584-Civil-2010 (Ct. Com. Pl. Pike Cnty.). (Doc. No. 1 at 55–57.) The Complaint also alleges that another case, No. 2681-Civil-2010, was filed against Plaintiffs, but does not allege the location of the court in which the case was filed. (Id. at 57.)

Case No. 2584-Civil-2010 was filed by Defendant G. Anderson Homes against MIK, Irish, and Defendants William Black and William Waldman, but was discontinued without prejudice. (Id.) Plaintiffs contend that "[l]ater, because this action named Black and Waldman as parties, with whom it was conspiring, G. Anderson Homes, Inc. discontinued the action without prejudice." (Id.) It is unclear if Plaintiffs are alleging that Defendant G. Anderson Homes joined the conspiracy after filing this lawsuit, or simply forgot they were conspiring with Black and Waldman before initiating the lawsuit and, upon realizing that they were part of a conspiracy with Waldman and Black, discontinued the lawsuit.

information regarding these lawsuits to Re/Max in order to further damage Plaintiffs' reputation. (Id.) In addition, MIK also commenced actions in state court against various parties, including several defendants in this case, for unpaid commissions and bonuses.[32]

### 15. Franchise Litigation

On August 25, 2010, less than 48 hours after the telephone call from Re/Max notifying Plaintiffs that the Re/Max franchise would terminate at the end of the month, Irish, MIK, Inc. and the remaining shareholders[33] of MIK commenced an equity action seeking injunctive relief in the Court of Common Pleas of Pike County, 1857-Civil-2010 (the "Franchise Litigation"). (Id. at 60.) The equity complaint alleged that Waldman and Black acted in bad faith, and attempted to terminate the franchise following Irish's attempt to obtain Lakefront's records in the Records Action. (Id.) Re/Max opposed the allegations and commenced a separate lawsuit in a Colorado federal court. (Id. at 61.) The Complaint alleges that Re/Max opposed the Franchise Litigation "to hide the conspiracy of which it had become a part." (Id.)

During the Franchise Litigation, at the deposition of Waldman, he was handed a note by Black that read "Save Tim," referring to Tim Meagher. (Id.) The Complaint alleges that Ferguson, Tim Meagher, Waldman, and Black made various misrepresentations during their depositions. (Id. at 61–62.)

---

[32] The case numbers for the civil actions filed by MIK are as follows: No. 2412-Civil-2010 (Ct. Com. Pl. Pike Cnty.); No. 2596-Civil-2010 (Ct. Com. Pl. Pike Cnty.); No. 700-Civil-2011 (location of court not alleged in Complaint). (Doc. No. 1 at 57–59.) MIK also filed an action before a district magistrate against Defendants G. Anderson Homes, Inc. and Grace Anderson, No. 417-DM-2010. (Id. at 59.) MIK prevailed before the district magistrate, but G. Anderson Homes appealed. (Id.) The case is now pending before the Court of Common Pleas at No. 1329-Civil-2010. (Id.) As of the date of the issuance of this Opinion, the Court has not been informed of the outcome of this case.

[33] These other shareholders are not named as plaintiffs in the Complaint filed in the instant case.

On November 1, 2010, the court held a trial on the equity complaint. (Id. at 63.) The trial court ruled against Irish and MIK. (Id.) Following the decision of the trial court, Irish and MIK were no longer permitted to do business under the name Re/Max. (Id.)

### 16.    Receivership Litigation

On September 24, 2010, Irish commenced an equity action in the Court of Common Pleas of Pike County, No. 2099-Civil-2010 (the "Receivership Litigation"). (Id.) The pleadings filed by Irish sought: (1) the dissolution of Lakefront; (2) the appointment of a receiver; and (3) injunctive relief. (Id. at 64.) During the Receivership Litigation, Ferguson, Waldman, and Black admitted transferring $925,000 to Carversville Development Company to renovate the 1740 House. (Id.) The court appointed John J. Martin as receiver. (Id.) After being appointed receiver, Martin failed to secure Lakefront's books and records, and failed to prevent Bugaj "from assisting those who hand plundered [Lakefront], including Ferguson, Black, and Waldman." (Id.)

After being appointed receiver, Martin commenced an action against Ferguson, Waldman, Black, Woldow, Carversville Development Company, and Carversville Group in the Court of Common Pleas of Bucks County. (Id.) This action sought to recoup funds diverted to the 1740 House. (Id.) Martin has not filed any other lawsuits, including a lawsuit alleging a scheme to defraud Irish by the various defendants named in the Complaint. (Id.)

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663; see Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v.

Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234–35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Moreover, Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b) requires a plaintiff to plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was

made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir. 2006) (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992)).

## IV.     ANALYSIS

### A.      Elements of Plaintiffs' RICO Claims

The congressional purpose in enacting RICO is "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-617, at 76 (1969). The provisions of RICO encompass complex crimes involving multiple elements. Although RICO is a criminal offense, the statute also provides civil remedies to plaintiffs injured by RICO activity. 18 U.S.C. § 1964(c).

Four prohibited activities are codified in RICO at 18 U.S.C. § 1962(a)–(d), each of which provides a separate cause of action in this civil lawsuit. Subsections (a) and (b) address the infiltration of legitimate organizations by "outsiders," which cover illegal activities such as money laundering and acquiring an interest in a legitimate organization with racketeering proceeds. Subsection (c) is restricted to persons "employed by or associated with" an enterprise that is engaged in racketeering activity. Reves v. Ernst & Young, 507 U.S. 170, 185 (1993). Subsection (d) addresses a conspiracy to violate subsection (a), (b), or (c).

In the Complaint, Irish alleges that specified defendants have violated all four RICO provisions, while other defendants have violated § 1962(c)–(d) only. A summary of the elements of these causes of action follows.[34]

---

[34] Because 18 U.S.C. § 1962(c) is the substantive RICO provision primarily used in litigation, the Court will review the elements of § 1962(c) before addressing § 1962(a) and (b).

### 1. 18 U.S.C. § 1962(c)

18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"To plead a RICO claim under § 1962(c), 'the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362 (3d Cir. 2010) (quoting Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004)).

### a. Defendant Must Be Associated With an Enterprise

In order to establish a violation of § 1962(c), a plaintiff must allege the existence of an enterprise. An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must have at least three structural features: [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). "[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" Id. (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

Merely being part of an enterprise is not enough to establish a RICO violation. A plaintiff must also allege the presence of the additional elements noted above.[35]

### b. Defendant Must Conduct or Participate in the Conduct of the Enterprise's Affairs through a Pattern of Racketeering Activity

A plaintiff must also establish that a defendant participated in conducting the enterprise's affairs. The U.S. Supreme Court has said "[a]s a verb, 'conduct' means to lead, run, manage, or direct." Reves, 507 U.S. at 177 (citing Webster's Third New International Dictionary 474 (1976)). Regarding the definition of "participate," the Court has held:

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

Id. at 179 (footnote omitted). "[O]ne is not liable under [§ 1962(c)] unless one has participated in the operation or management of the enterprise itself." Id. at 183. Section 1962(c) "cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs. Id. at 185 (emphasis in original).

### c. Defendant Must Knowingly Commit At Least Two Acts of Racketeering Activity

A plaintiff must establish that a defendant committed at least two acts of racketeering activity. "Racketeering activity" is defined at 18 U.S.C. § 1961(1). The defined racketeering

---

[35] The RICO Case Statement filed by Plaintiffs describes the alleged enterprise as follows: "The members of the enterprise include the Carversville Defendants: Ferguson; Waldman; Black; Waldman and Black [GP]; Woldow; Vehstedt; Bugaj; Bugaj and Fischer, P.C.; Carversville [Development Company] and Carversville Group." (Doc. No. 58 at 21.) Defendants challenge whether an enterprise has been established. In view of the fact that the Court is dismissing the RICO counts on other grounds, there is no need to decide the merits of the claim regarding the sufficiency of the alleged enterprise.

acts are also referred to as "predicate acts." Mail fraud, wire fraud, and bank fraud are included as predicate acts under § 1961(1).[36]

> ### d. Two Acts of Racketeering Activity Committed By a Defendant Must Be Connected By a Common Scheme, Plan, or Motive Constituting a Pattern of Racketeering Activity

The Third Circuit has held:

> Simply pleading that a defendant "participated in the operation or management" of an enterprise, however, is not enough to make out a violation of § 1962(c). The defendant must have done so "through a pattern of racketeering activity." In other words, there must be not only a "nexus between the [defendant] and the conduct [of] the affairs of an enterprise," but also a nexus between the conduct of those affairs and the pattern of racketeering activity.

In re Ins. Brokerage Antitrust Litig., 618 F.3d at 371 (citing Univ. of Md. at Balt. v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993); Banks v. Wolk, 918 F.2d 418, 424 (3d Cir. 1990)) (internal citations omitted).

To establish a pattern of racketeering activity, a plaintiff must demonstrate more than a series of separate, isolated, or disconnected acts. A "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" Boyle, 556 U.S. at 947 (quoting Turkette, 452 U.S. at 583). "It is the 'person' charged with the racketeering offense — not the entire enterprise — who must engage in the 'pattern of racketeering activity.'" United States v. Bergrin, 650 F.3d 257, 267 (3d Cir. 2011) (citing H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 244 (1989)).

---

[36] 18 U.S.C. § 1961(1) provides, in relevant part:

> "[R]acketeering activity" means . . . any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud) . . . .

### e. The Enterprise Must Be Involved In or Affect Interstate Commerce

The final element under § 1962(c) is that the enterprise must be involved in or affect

interstate commerce. "[O]nly the criminal enterprise must affect interstate commerce — not the

conduct of each individual defendant." Rose v. Bartle, 871 F.2d 331, 357 n.38 (3d Cir. 1989)

(quoting United States v. Robinson, 763 F.2d 778, 781 n.4 (6th Cir. 1985)). "[T]he predicate acts

supporting a RICO violation may provide the nexus with interstate commerce." Id. (quoting

R.A.G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350, 1353 (5th Cir. 1985)). "The nexus with

interstate commerce required by RICO is 'minimal.'" Id. (quoting R.A.G.S. Couture, Inc., 774

F.2d at 1353).

### 2. 18 U.S.C. § 1962(a)

18 U.S.C. § 1962(a) provides:

> It shall be unlawful for any person who has received any income derived, directly
> or indirectly, from a pattern of racketeering activity . . . to use or invest, directly
> or indirectly, any part of such income, or the proceeds of such income, in
> acquisition of any interest in, or the establishment or operation of, any enterprise
> which is engaged in, or the activities of which affect, interstate or foreign
> commerce. . . .

In order to establish a violation of § 1962(a), a plaintiff must allege: "(1) that the defendant has

received money from a pattern of racketeering activity; (2) invested that money in an enterprise;

and (3) that the enterprise affected interstate commerce." Id. (citing Shearin v. E.F. Hutton Grp.,

Inc., 885 F.2d 1162, 1165 (3d Cir. 1989)).

Section 1962(a) is one of the two RICO substantive offenses that targets the actions of

"outsiders" corrupting otherwise legitimate organizations.[37] Section 1962(a) is "primarily

directed at halting the investment of racketeering proceeds into legitimate businesses, including

---

[37] The other section is §1962(b). See infra.

the practice of money laundering." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188 (3d Cir. 1993). Moreover:

> [T]he plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves. This allegation is required because section 1962(a) "is directed specifically at the use or investment of racketeering income, and requires that a plaintiff's injury be caused by the use or investment of income in the enterprise."

Id. (quoting Brittingham v. Mobil Corp., 943 F.2d 297, 303 (3d Cir. 1991)) (internal citations omitted) (emphasis added).

### 3.    18 U.S.C. § 1962(b)

18 U.S.C. § 1962(b) provides:

> It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

In order to recover under § 1962(b), "a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts." Lightning Lube, Inc., 4 F.3d at 1190. "Such an injury may be shown, for example, where the owner of an enterprise infiltrated by the defendant as a result of racketeering activity is injured by the defendant's acquisition or control of his enterprise." Casper v. Paine Webber Grp., Inc., 787 F. Supp. 1480, 1494 (D.N.J. 1992). A plaintiff must also establish a nexus between ownership interest in the enterprise and the alleged racketeering activities. Lightning Lube, Inc., 4 F.3d at 1190. A defendant with a legitimate interest in an enterprise unrelated to racketeering acts has not violated § 1962(b). Id.

### 4.    18 U.S.C. § 1962(d)

18 U.S.C. § 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." In order to demonstrate a

RICO conspiracy under § 1962(d), a plaintiff must demonstrate two essential elements: "(1) knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities." Knit With v. Knitting Fever, Inc., No. 08-4221, 2011 WL 891871, at *4 (E.D. Pa. Mar. 10, 2011) (citing Salinas v. United States, 522 U.S. 52, 66, (1997)). "Underlying a § 1962(d) claim is the requirement that plaintiff must show that defendants agreed to the commission of a 'pattern of racketeering.'" Breslin v. Brainard, No. 01-7269, 2003 WL 22351297, at *13 (E.D. Pa. Oct. 14, 2003) (citing Banks v. Wolk, 918 F.2d 418, 421 (3d Cir.1990)).

## B. Plaintiffs Have Not Stated a Claim under RICO for Which Relief May Be Granted

### 1. Plaintiffs Lack RICO Standing

One of the prerequisites to filing a RICO claim under 18 U.S.C. § 1962(a)–(d) is that the plaintiff have standing to bring such a claim in the first place. Section 1964(c) provides: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit . . . ." The U.S. Supreme Court has interpreted this provision and held that "the plaintiff only has standing [to bring a claim under RICO] if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); see Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago, 747 F.2d 384, 398 (7th Cir. 1984) aff'd, 473 U.S. 606 (1985) ("The criminal conduct in violation of section 1962 must, directly or indirectly, have injured the plaintiff's business or property. A defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured.").

The Complaint's sixty-nine pages of factual allegations allege harm to Lakefront and other entities, such as Blue Cross, ESSA, and the IRS. Plaintiffs do not have standing to raise any of these claims because the injuries were to Lakefront and the other entities. Any alleged violation of § 1962 did not directly harm Plaintiffs.

### a. Plaintiffs' Claims Regarding Harm to Lakefront by Carversville Defendants, Accounting Defendants, and ESSA Defendants Are Derivative in Nature and Do Not Confer Standing on Plaintiffs

"To have standing under civil RICO, a plaintiff must allege that it suffered an injury to its business or property interest 'by reason of a violation of section 1962 . . . .'" Penn Mont Sec. v. Frucher, 502 F. Supp. 2d 443, 466 (E.D. Pa. 2007) (quoting 18 U.S.C. § 1964(c)). "The 'by reason of' provision means the complaint must allege that defendants' RICO violation proximately caused injury to the plaintiff's business or property." Id. (citing Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 274 (1992); Anderson v. Ayling, 396 F.3d 265, 267 (3d Cir. 2005)).

Although Irish is a member of the Lakefront limited liability company, Lakefront is not a plaintiff in this action. The Complaint, however, alleges harm to Lakefront. Irish cannot recover for those alleged harms because the harm to Irish, if any, is indirect because he is only a member of the LLC. A plaintiff must suffer a direct injury in order to have RICO standing. "Indirect or derivative harms to a shareholder plaintiff do not confer RICO standing." Id. at 466–67 (quoting Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 933–34 (3d Cir. 1999)).

Lakefront is a limited liability company ("LLC"), not a corporation. In At the Airport v. ISATA, LLC, 438 F. Supp. 2d 55, 62–64 (E.D.N.Y. 2006), the court held that a member of an LLC cannot pursue a RICO claim on its own behalf when the LLC is the directly injured party.

The court refused to deviate from the established rule that the RICO statute requires a "direct injury," and that the member of an LLC filing a RICO claim on its own behalf only has derivative standing.[38] Plaintiffs here have not brought a derivative lawsuit on behalf of Lakefront — they seek to recover damages for themselves.

Despite what appears to be a clear legal precept, the question still remains whether the nature of the claims alleged are direct — that is, injuring Irish directly — or derivative — that is, injuring the company and harming Irish indirectly only due to his status as a member of the LLC.

> In determining whether an alleged injury is direct or derivative for purposes of RICO, a court must make an independent determination as to whether a plaintiff's claim asserts a direct or derivative harm. Accordingly, the parties' characterization of the claims is not dispositive.
>
> Whether a claim is direct or derivative depends on "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or any other remedy (the corporation or the stockholders, individually)."
>
> If the corporation suffers the alleged harm and would receive the benefit of the recovery, the claim is derivative. In contrast, if the shareholder suffers the injury and would stand to directly benefit from a successful claim, the claim is direct and confers RICO standing on the plaintiff shareholder.

McCoy-McMahon v. Godlove, No. 08-5989, 2011 WL 4820185, at *14 (E.D. Pa. Sept. 30, 2011) (quoting Penn Mont Secs. v. Frucher, 502 F. Supp. 2d 443, 458 (E.D. Pa. 2007)) (internal citations omitted). Applying these precepts to the facts here, it is clear that Lakefront suffered the harm and should receive the benefit of the recovery.

---

[38] Pennsylvania law permits a derivative action on behalf of a limited liability company. See Pennsylvania Rule of Civil Procedure 1506 ("In an action to enforce a secondary right brought by one or more stockholders or members of a corporation or similar entity because the corporation or entity refuses or fails to enforce rights which could be asserted by it, the complaint shall set forth . . . .") (emphasis added).

First, the Complaint targets the harm done to Lakefront. It contains allegations that Defendants engaged in acts of mail and wire fraud that harmed Lakefront under the doctrine of corporate waste. For instance, it alleges:

- "The checks to Defendant Ferguson and Black for services not rendered and the free gas were a waste of the corporate assets of [Lakefront]" (Doc. No. 1 at 17);

- "The monies and benefits paid to Hemke, including monies for services he did not render, and for loans, and for his personal use of the assets of [Lakefront,] were without notice to the Plaintiff Irish and were a waste of corporate assets" (id. at 18);

- "The Defendant ESSA and Lewis had actual knowledge that monies paid from the assets of [Lakefront] constituted a waste of the assets of [Lakefront] (id. at 26);

- "The creation and actual use of [the credit card processing account] was without corporate authority and was a waste of the assets of [Lakefront]" (id. at 37).

"Corporate waste is a 'classic' derivative harm because 'it diminishes the value of the corporation as a whole and entitles the corporation to recover damages.'" McCoy-McMahon, 2011 WL 4820185, at *14 (quoting Penn Mont Secs., 502 F. Supp. 2d at 465) (quotation marks omitted). Allegations of corporate waste do not confer standing on a member of a limited liability company.

Second, the RICO Case Statement (Doc. No. 58) describes the objective of the alleged RICO enterprise as follows[39]: "The purpose of the enterprise was to plunder Lakefront" (id. at 22); "The longevity of the enterprise was sufficient to reach the purpose of plundering Lakefront and hiding the plundering" (id. at 23); "The pattern of racketeering activity allowed the

---

[39] A RICO case statement may be considered in assessing the merits of Plaintiffs' RICO claims. De Lage Landen Fin. Servs. v. Rasa Floors, LP, No. 08-0533, 2009 WL 564627, at *10 (E.D. Pa. Mar. 5, 2009).

Defendants Ferguson, Waldman, Black and Woldow to financially benefit from the plundering of Lakefront . . . ." (id. at 24).

This type of injury, the looting of a company, also does not confer individual standing on Plaintiffs. In Manson v. Stacescu, 11 F.3d 1127 (2d Cir. 1993), a similar case to this one, the appellants alleged that the appellees engaged in acts that were "part of a scheme through which appellees looted the Company to the point of bankruptcy in order to enrich themselves." Id. at 1129. The appellants argued that because one of the appellants was a fifty percent shareholder in the company, he had standing under RICO. The court rejected this argument, holding that the injuries sustained by the appellant were distinct from those sustained by the corporation, the only party directly injured. Therefore, he did not have standing. Id. at 1131–32.

In John L. Motley Associates, Inc. v. Rumbaugh, 104 B.R. 683 (E.D. Pa. 1989), another similar case, Rumbaugh alleged that an oral contract between two other parties created a conspiracy to waste the assets of a corporation in which Rumbaugh was a forty-nine percent shareholder. The court held:

> The RICO count asserted by Rumbaugh alleges dissipation of the corporate assets. This is an injury done to the corporation itself rather than to any individual shareholder. The RICO injury asserted by Rumbaugh alleges a harm to the corporation and not a harm to Rumbaugh in his individual capacity. There is no independent shareholder standing to assert RICO claims where the harm to the shareholders is derivative of the harm to the corporation. This RICO action is derivative and belongs to the corporation.

Id. at 687.

Manson and Motley Associates illustrate Plaintiff's lack of standing for any acts alleged to have harmed Lakefront, including the allegations noted above. As in Manson and Motley Associates, Plaintiffs allege here that Carversville Defendants, Accounting Defendants, and ESSA Defendants "plundered," or looted the corporate assets of Lakefront. For instance, Plaintiffs allege: (1) Ferguson purchased real estate from Lakefront at a price far below its

market value; (2) Carversville Defendants borrowed money for their own benefit and repaid the

loans with Lakefront's funds; (3) Lakefront paid for the Blue Cross benefits of an employee who

was not an employee of Lakefront; and (4) Carversville Defendants used Lakefront's assets to

maintain and renovate the "1740 House," then sold the 1740 House at a large profit, without

reimbursing Lakefront. Similar to <u>Manson</u> and <u>Motley Associates</u>, these alleged harms are to

Lakefront, not Plaintiffs. Therefore, the harms are derivative and do not confer RICO standing.

Moreover, the allegations in the Complaint of "corporate waste" are also derivative.

Third, on September 24, 2010, Irish filed the equity action known as the Receivership

Litigation. (Doc. No. 1 at 63–64.) In the complaint filed in that action, Irish requested, among

other things, that a receiver be appointed to oversee the dissolution of Lakefront. (<u>Id.</u> at 64.) On

January 21, 2011, John R. Martin was appointed receiver. (<u>Id.</u>) The order of the Court of

Common Pleas of Pike County appointing the receiver states[40]: "[T]he Liquidating Receiver

shall have the power and duty to collect the assets of [Lakefront]. . . . Assets of [Lakefront] shall

include all claims and/or causes of action which the Company holds against any person or entity,

including members of the Company. . . ." (Doc. No. 97-1 at 1.) Thus, following the order

appointing the receiver, the receiver had the power to bring claims on behalf of Lakefront.

---

[40] The judicial order appointing the receiver is attached to Defendants Ferguson, Waldman, Black, Waldman and Black GP, Carversville Development Company, and Carversville Group's Memorandum of Law in Support of the Motion. (Doc. No. 97-1.)

When reviewing a motion to dismiss, a district court "can consider 'a document integral to or explicitly relied upon in the complaint.'" In re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis omitted). A district court may also review "an 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" In re Rockefeller Ctr. Props., Inc., 184 F.3d 280, 287 (quoting Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Here, the Court may consider this judicial order in deciding the instant Motions to Dismiss because Plaintiffs refer to, and rely on, the Receivership Litigation in the Complaint.

Plaintiffs were dissatisfied that the receiver did not bring the instant RICO claims against Defendants. (See Doc. No. 1 at 65.) The failure of the receiver to file such a suit did not give Plaintiffs the right to do so on their own. The Receivership Litigation did not confer standing on Plaintiffs to pursue all actions the receiver did not file. Moreover, RICO standing was not conferred on Plaintiffs through their filing a complaint seeking the appointment of the receiver.

In sum, for the above reasons, Plaintiffs have not stated a claim upon which relief may be granted to them for any alleged harm to Lakefront.[41] The allegations regarding Lakefront, discussed supra in Sections (II)(C)(2), (4)–(8), and (10), do not confer standing on Plaintiffs.

### b. Plaintiffs Have No Standing to Recover Damages for Harm to Blue Cross, the Internal Revenue Service, or ESSA

Allegations in the Complaint also assert harm to Blue Cross, the IRS, and ESSA. For instance, Plaintiffs allege that Owner Defendants and Vehstedt participated in a scheme in which Vehstedt represented to Blue Cross that Joyce Cooke, the "innkeeper" of the 1740 House, was an employee of Lakefront, although she was not an employee. (Doc. No. 1 at 15.) This is a fraud upon Blue Cross, which is not a plaintiff in this action.

The Complaint also alleges that Owner Defendants and Vehstedt "created and/or altered records which underreported [Lakefront's] income and profits. . . . The underreporting of income and profit has resulted in inaccurate tax returns." (Id. at 19.) Intentionally filing an inaccurate tax return is a fraud upon the Internal Revenue Service, or in effect, the United States Government, which is also not a plaintiff in this action.

Finally, in a puzzling circle of logic, the Complaint alleges that Carversville Defendants "duped" ESSA and William Lewis into making loans to Carversville Defendants that were repaid

---

[41] At the November 6, 2012 hearing on these Motions, Plaintiffs' counsel conceded that Plaintiffs do not have standing to file suit for alleged frauds upon Lakefront. (Mot. Hr'g Tr. 153:5–155:10.)

by Lakefront. Curiously, ESSA and William Lewis are also named as Defendants in this action for their role in making the very same loans. The Complaint states: "The methods by which the Carversville Defendants could and would dupe ESSA and Lewis, or pretend to dupe them, and by which ESSA and Lewis could pretend to be duped, were as follows . . . ." (Id. at 24.) The Complaint then lists six paragraphs describing how Carversville Defendants purportedly misled ESSA and Lewis about Lakefront's role in repaying the loans to ESSA. Reading these allegations in the light most favorable to Plaintiffs, they establish at most that Carversville Defendants manipulated ESSA and Lewis.

In short, Plaintiffs have no RICO standing to bring an action on behalf of Blue Cross, the IRS, ESSA, and Lewis, because they were not directly injured by reason of any conduct of these Defendants. The injuries, if any, were to Blue Cross, the IRS, and ESSA. In these situations, Plaintiffs have no standing to pursue a claim on their own behalf for a fraud committed on these entities.

### 2. Plaintiffs' Claims Involving the Re/Max Franchise Are Barred By Collateral Estoppel

To the extent Plaintiffs seek to recover damages under RICO for the termination of the Re/Max Franchise, those claims are barred by collateral estoppel. "The Full Faith and Credit Act, 28 U.S.C. § 1738 . . . requires [a] federal court to 'give the same preclusive effect to a state-court judgment as another court of that State would give.'" Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 293 (2005) (quoting Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 523 (1986)).

On August 25, 2010, MIK initiated the Franchise Litigation by filing a complaint in the Court of Common Pleas of Pike County against Waldman and Black GP and Re/Max, seeking an

injunction to stop the Re/Max Franchise from being terminated. (Doc. No. 1 at 60–63; see supra

Section (II)(C)(15).) The Franchise Litigation complaint alleged, in relevant part, the following:

> Defendants, Black and Waldman as the "straw," in retaliation, and in bad faith, with improper motive due to corporate litigation pending and expected to be pending between the Plaintiff, George Irish and Co-Defendant, Waldman and Black and others, including Harry Ferguson as set forth hereafter, cancelled the [Re/Max] Franchise Agreement effective August 31st, with no advance notice to Plaintiffs.

> . . . .

> Co-Defendant Remax International has or is contacting all eleven (11) agents of MIK, Inc. as Broker to direct them to other Remax Franchises in the greater Northeast, PA region, therefore interfering with agent contracts with Co-Plaintiff MIK, Inc., and causing severe harm to agents and their families, and to MIK, Inc. support staff and employees and to the customer, [sic] clients, both buyers and sellers of Remax of Lake Wallenpaupack North.

> Further, Plaintiffs have learned that Defendants, Waldman and Black have intentionally announced the cancellation of the [Re/Max] Franchise to Plaintiff's competitors to attempt to further harm and destroy the Plaintiffs.

> As set forth above, the Co-Defendants, Black and Waldman have and are acting in bad faith with evil motives as the "straws" of the Franchise, because of George Irish's filing of an action against Lakefront . . . and the Co-Defendants, Black and Waldman . . . seeking records, and an accounting, etc., from Lakefront . . . and Defendants, Black and Waldman . . . .

> The Corporate Records of Lakefront . . . have already shown after initial audit by a Forensic Accountant, a clear pattern of fraud, diversion of corporate assets, and misappropriation of corporate funds and misappropriation of credit worthiness by the Co-Defendants, Waldman and Black and Lakefront's the [sic] operating Manager, Harry Ferguson.

> The bad faith and substantially harmful conduct of Black and Waldman as "straw" owners in cancelling the Franchise is further supported by the conduct of William Waldman in that he attempted to extort from Plaintiff, Irish, surrender of his claim, ownership and/or potential cause of action against Lakefront . . . Harry Ferguson, and Co-Defendants Black and Waldman . . . .

(Doc. No. 151-1 at 4–6.)

Re/Max moved to dismiss the complaint for lack of standing, and on November 2, 2010, the court entered an order granting Re/Max's motion. (Doc. No. 97-2.) The court reasoned that

on February 1, 2005, the Re/Max franchise previously owned by MIK was transferred to Black and Waldman pursuant to a transfer agreement. (Id. at 1.) Black and Waldman then entered a franchise agreement with Re/Max, also dated February 1, 2005. (Id.) Neither Irish nor MIK was a party to the new Franchise Agreement. (Id.) The court noted: "Plaintiffs also claim that purchasers of the franchise in 2005 were simply straw parties. However, such a claim contradicts the clear and unambiguous wording of the Franchise Agreement and Transfer Agreement and challenges the underlying validity of the contract itself."[42] (Id. at 3.)

The state court concluded Irish and MIK did not have standing to seek a preliminary injunction because they were not parties to the Franchise Agreement, and that under the terms of the Transfer Agreement, "there are no rights reserved to any of the Plaintiffs to litigate any matters related to the franchise." (Id.) In the Complaint, Plaintiffs admit that "after an adverse ruling of the trial court, and the refusal of the Superior Court to extend a stay past November 23rd, Irish and MIK were no longer permitted to do business under the name ReMax." (Doc. No. 1 at 63.)

As a threshold matter, Plaintiffs contend the Court may not consider Defendants' collateral estoppel argument because collateral estoppel is an affirmative defense. Plaintiffs are correct that collateral estoppel is an affirmative defense, and that normally an affirmative defense is first considered during a motion for summary judgment, not a motion to dismiss. However, within the Third Circuit a court may consider an affirmative defense on a Rule 12(b)(6) motion to dismiss if the bar established by the defense is "apparent on the face of the complaint." Bethel v. Jendoco Const. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978).

---

[42] The state court held that a claim challenging the validity of the Transfer Agreement must be submitted to arbitration under the terms of the Agreement. (Doc. No. 97-2 at 3.) Plaintiffs do not challenge the validity of the contract here, and instead continue to assert that Waldman and Black GP is a "straw party."

In Brody v. Hankin, 145 F. App'x 768 (3d Cir. 2005), a case involving alleged amendments to a contract, the Third Circuit reversed the district court after it granted a motion to dismiss on res judicata grounds.[43] The court reasoned that the district court erred when it "relied on facts from documents related to [an] arbitration proceeding, but not mentioned in, or attached to, the [plaintiffs'] complaint." Id. at 772. The court was not persuaded by the defendant's argument that the plaintiffs "'opened the door' for the District Court to consider materials submitted to the arbitrators by discussing the arbitration in the complaint." Id. The Third Circuit held that although a district court "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document," this proposition did not bring the defendant "close to showing res judicata on the face of the [plaintiffs'] complaint." Id. (quoting Pension Benefit Guar. Corp. v. White, 998 F.2d 1192, 1196 (3d Cir. 1993)).

This case is distinguishable from Brody. Brody reiterated that an affirmative defense must appear "on the face of the complaint" in order for the defense to be considered on a

---

[43] "Res judicata requires that federal courts give state court judgments the same preclusive effect that the issuing state courts would give them. While this doctrine sometimes is used narrowly to refer to claim preclusion, whereas collateral estoppel customarily refers to issue preclusion, [the Third Circuit] ha(s) previously noted that the preferred usage of the term res judicata encompasses both claim and issue preclusion." Russo v. City of Philadelphia, 459 Fed. App'x 176, 178 (3d Cir. 2012) (internal quotations omitted).

Additionally, in the Third Circuit, a number of affirmative defenses not listed in Rule 12(b), including res judicata, can be decided at the motion to dismiss stage. See Ball v. Famiglio, No. 12-1067, 2013 WL 4038562, at *7 n.16 (3d Cir. Aug, 9, 2013) (". . . a number of affirmative defenses that are not listed in Rule 12(b) could still be made by motion, provided that the basis of the defense was apparent on the face of the complaint. . . Williams v. Murdoch, 330 F.2d 745, 749 (3d Cir. 1964) (affirmative defense of res judicata may be raised by a motion to dismiss or by an answer)).

Thus, given the similarity between res judicata and collateral estoppel, both can be the subject of a motion to dismiss when the defense is obvious on the face of the complaint.

12(b)(6) motion to dismiss. In <u>Brody</u>, the district court erred when it relied on facts from court documents not mentioned in the plaintiffs' complaint because it "effectively converted [the defendant's] motion to dismiss into a motion for summary judgment without notifying the [plaintiffs]." <u>Id.</u> at 768.

The Third Circuit noted, however, that the plaintiffs' complaint did mention two other documents uncovered in arbitration: "copies of the alleged 1991 amendments to the . . . agreements [at issue] (along with related management and leasing agreements, and maintenance agreements), and a statement by . . . counsel, presumably contained in a letter or deposition transcript, that no letters to a limited partner referring to the 1991 amendments could be found." <u>Id.</u> at 772. The court held that "[t]he District Court thus properly could have considered these documents under <u>White</u>." <u>Id.</u>

Here, the two documents at issue from the Franchise Litigation are the complaint and the November 2, 2010 order. The order was attached to the Memorandum of Law in Support of the Motion to Dismiss filed by Ferguson, Waldman, Black, Waldman and Black GP, Carversville Development Company, and Carversville Group (Doc. No. 97-2), and the complaint was attached to these Defendants' Supplemental Memorandum of Law (Doc. No. 151-1). Both documents are undisputedly authentic, and both documents are mentioned in the Complaint. (<u>See</u> Doc. No. 1 at 60 (discussing allegations contained in the Franchise Litigation complaint), 63 (discussing the "adverse ruling" of the November 2, 2010 order).) Thus, the Court may consider these documents in weighing Defendants' affirmative defense of collateral estoppel because they are specifically referred to, and also relied on, in the Complaint filed by Plaintiffs.[44]

---

[44] Although Plaintiffs contend the Court should not consider the Franchise Litigation complaint and order, Plaintiffs have analyzed these documents and presented arguments about them in their

In this case, the Complaint alleges:

(1)    Waldman and Black GP executed the Transfer Agreement "as an accommodation to the Plaintiff Irish" (id. at 13–15);

(2)    Waldman and Black GP was a mere "straw party" (id. at 37, 38, 39, 40, 45, 60);

(3)    "ReMax knowingly and willingly accepted Waldman and Black as straw parties and as franchise 'owners' without checking references; without doing any background check except a credit check; without verifying any of their business experience; and without acquiring the payment of any fees from them" (id. at 37–38);

(4)    Waldman and Black GP plotted with Meagher Defendants and Re/Max, and met with law enforcement and the Pike County District Attorney, "for the purpose of transferring/acquiring the ReMax Franchise under which Irish and MIK did business and to do so in a way that would most harm Irish and MIK" (id. at 41);

(5)    "Absent bad faith, no reason existed for Waldman and Black to not renew the Franchise Agreement" (id. at 46).

"Congress has directed federal courts to look principally to state law in deciding what effect to give state-court judgments." Lance v. Dennis, 546 U.S. 459, 466 (2006) (emphasis in original). Under Pennsylvania Law:

> [C]ollateral estoppel precludes relitigation of an issue determined in a previous action if: (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the collateral estoppel is asserted had a full and fair opportunity to litigate the issue in

---

Supplemental Briefs in Opposition to the Motions to Dismiss. (See, e.g., Doc. No. 169 at 21–26.)

the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

First Korean Church of N.Y., Inc. v. Cheltenham Twp. Zoning Hearing Bd., No. 05-6389, 2012 WL 645986, at *9 (E.D. Pa. Feb. 29, 2012). aff'd, No. 12-1917, 2013 WL 362819 (3d Cir. Jan. 24, 2013) (quoting Office of Disciplinary Counsel v. Kiesewetter, 889 A.2d 47, 50–51 (Pa. 2005)).

Plaintiffs maintain here that they are not collaterally estopped because the issues and parties in this case and the Franchise Litigation are not identical. They contend:

> [A]ll that was actually litigated [during the Franchise Litigation] was the ownership of the Re/Max Franchise, determined through a review of only the four corners of the Franchise Agreement. The failed attempt to prevent the termination of a franchise is a far cry from the issues in the instant case. This is nothing to say about the identities of the parties between the Franchise Litigation and the instant case.

(Doc. No. 135 at 28 (emphasis in original).) Their argument is unpersuasive.

Two elements of collateral estoppel are at issue: "the issue decided in the prior case is identical to the one presented in the later action" and "the party against whom collateral estoppel is asserted was a party or in privity with a party in the prior case." First Korean Church of N.Y., 2012 WL 645986, at *9. "To defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be 'substantial.'" Raytech Corp. v. White, 54 F.3d 187, 191 (3d Cir. 1995). In the Franchise Litigation, the issue was whether Plaintiffs "can exercise rights of Black and Waldman under the Franchise Agreement which allow injunctive relief to prevent irreparable harm." (Doc. No. 97-2 at 2.) Answering this question necessitated determining whether Plaintiffs had standing to assert claims as owners of the Re/Max Franchise. In reaching the conclusion that Plaintiffs did not have standing to bring claims as owners of the Franchise, the state court held that under the Transfer Agreement, "there

are no rights reserved to any of the Plaintiffs to litigate any matters related to the franchise." (Id. at 3.)

In this case, the issue is whether Plaintiffs may assert RICO or antitrust claims alleging that Waldman and Black GP, Ferguson, Meagher Defendants, and Re/Max conspired to terminate the Re/Max Franchise in order to injure Plaintiffs and drive them out of business. Both the claim for a preliminary injunction in the Franchise Litigation and the RICO and antitrust claims brought here concern the same legal issue: Do Plaintiffs have standing to litigate for their own benefit matters related to the Re/Max Franchise although they were not owners of the Franchise? The question was answered in the negative in the state court and will be answered the same way here. The legal standard in both cases on standing is not substantially different. After February 1, 2005, Plaintiffs were, in effect, mere employees or independent contractors operating under the Re/Max Franchise owned by Waldman and Black GP, and did not have standing to challenge the attempted transfer or termination of the franchise.

Although the Complaint acknowledges the adverse ruling of the state court, Plaintiffs mischaracterize the impact of the ruling. The state court held that under the February 1, 2005 Transfer Agreement, Plaintiffs transferred all ownership rights under the Re/Max Franchise, including the right "to litigate any matters related to the franchise," to Waldman and Black GP. (Doc. No. 97-2 at 3.) Plaintiffs characterize the impact of the ruling, however, as simply preventing them from continuing "to do business under the name ReMax." (Doc. No. 1 at 63.) While this is literally correct, it misconstrues the full breadth of the state court ruling — that Plaintiffs agreed in the February 1, 2005 Transfer Agreement to transfer their ownership rights, including the right to litigate matters related to the Re/Max Franchise.

In addition, as noted previously, collateral estoppel requires that "the party against whom collateral estoppel is asserted was a party or in privity with a party in the prior case . . . ." First Korean Church of N.Y., 2012 WL 645986, at *9. The plaintiffs in the Franchise Litigation were, among others, MIK, Inc. and George Irish,[45] and the defendants were "William Black and William Waldman, a Partnership," and Remax International, Inc. (Doc. No. 151-1 at 1.) Here, the parties against whom collateral estoppel is asserted are Plaintiffs MIK, Inc. and George Irish. Therefore, despite Plaintiffs' claim, the parties are identical in both cases.

The November 2, 2010 order from the Court of Common Pleas of Pike County conclusively establishes that Plaintiffs did not own the Re/Max franchise after February 1, 2005, and were simply employees or independent contractors working for the Re/Max franchise owned by Waldman and Black GP. Moreover, after February 1, 2005, "there are no rights reserved to any of the Plaintiffs to litigate any matters related to the [Re/Max] franchise." (Doc. No. 97-2 at 3.) Because Plaintiffs are impermissibly attempting to relitigate the adverse ruling in state court related to the Re/Max franchise to which "full faith and credit" must be given, dismissal of any claims concerning the termination or ownership of the Re/Max franchise is warranted.

### 3. Plaintiffs Have Not Established That Carversville Defendants or Accounting Defendants Have Committed a Predicate Act With Regard To the Schedule K-1 Forms

The crimes designated as racketeering activity, also known as "predicate acts," are found at 18 U.S.C. § 1961(1). Reading the Complaint in the light most favorable to Plaintiffs, it attempts to allege that Defendants committed the predicate acts of mail fraud and wire fraud.[46]

---

[45] The other plaintiffs were Gregory A. Vannetta, Russ Kline, and Joseph Murray. (Doc. No. 151-1 at 1.)

[46] Plaintiffs also contend that Defendants engaged in bank fraud in regard to the loans made by ESSA Defendants. Bank fraud is a predicate act under 18 U.S.C. § 1961(1). As discussed supra, Plaintiffs do not have standing to raise claims related to ESSA. Therefore, only mail fraud and wire fraud are relevant to this discussion.

However, considering the fact that many of the Complaint's sixty-nine pages of factual allegations cover matters over which Plaintiffs lack RICO standing or are precluded from relitigating under the law of collateral estoppel, the Court must now examine the only other claim of alleged fraud that remains. It concerns the allegedly false Schedule K-1 forms.

During the November 6, 2012 hearing on the Motions to Dismiss, after the Court inquired about instances of fraud that Plaintiffs claim they have standing to allege, the only activity identified with specificity by Plaintiffs' counsel was the mailing to Irish of false Schedule K-1 tax forms by Accounting Defendants. (Mot. Hr'g Tr. 155:11–21; see supra Section (II)(C)(9)(b).) The IRS describes the purpose of the Schedule K-1 form as follows:

> The corporation uses Schedule K-1 to report your share of the corporation's income (reduced by any tax the corporation paid on the income), deductions, credits, etc. . . . .

Shareholder's Instructions for Schedule K-1 (Form 1120S) (2012), Internal Revenue Service, http://www.irs.gov/instructions/i1120ssk/ch01.html#d0e39 (last visited Aug. 23, 2013).[47] The Schedule K-1 forms given to Irish show losses Lakefront incurred from year to year, which were being passed on to members of the LLC to report on their individual tax returns. This would lower the federal tax due and owing by them.

"The essential elements of an offense under 18 U.S.C. § 1341 are (1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme charged with the specific intent to defraud; and (3) the use of the United States mails in furtherance of the fraudulent scheme." United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994) (footnote omitted). "The wire fraud statute, 18 U.S.C. § 1343, is identical to the mail fraud statute except it speaks of communications transmitted by wire," United States v. Frey, 42 F.3d 795, 797 (3d

---

[47] Because the Complaint does not describe the Schedule K-1 Form's purpose, the Court has taken judicial notice of this description on the IRS website. See supra note 15. The Schedule K-1 form may also report the share of business losses.

Cir. 1994), although wire fraud does require an interstate transmission, while mail fraud does not have a similar requirement.

"[N]ot every use of the mails or wires in connection with a scheme is punishable under sections 1341 or 1343. . . . To support a mail fraud conviction, a mailing must further the scheme to defraud or be incident to an essential part of that scheme.'" Frey, 42 F.3d at 797–98 (quoting United States v. Ruuska, 883 F.2d 262, 264 (3d Cir. 1989)). "[T]he words 'to defraud' in the mail fraud statute have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" Carpenter v. United States, 484 U.S. 19, 27 (1987) (quoting McNally v. United States, 483 U.S. 350, 358 (1987), superseded on other grounds by statute, Pub. L. No. 100–690, 102 Stat. 4181 § 7603; Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)).

During the November 6, 2012 hearing, the Court had the following exchange with Plaintiffs' counsel:

> THE COURT: [W]hat did [Defendants] do to give [Irish] . . . standing?
>
> MR MURRAY: Well, that's when — when — when — when Mr. Irish starts — files, as pled in the Complaint, a records action and says, you know, I — I — I got a K-1 here that I — I'm not so sure is accurate. So he makes [sic], as pled in the Complaint, can I see the records? A few days later, can I see the records? Then he files a records action.
>
> . . . .
>
> THE COURT: All right. Now, how is that a fraud, not to give somebody records?
>
> MR. MURRAY: You — you asked me when — when Mr. Irish starts to get standing, and that's when they start — start going back against him to hurt him.
>
> THE COURT: All right. But so far you've described to me a scenario where they just haven't given him records that he's asked for.

51

MR. MURRAY: Well, no. They — they actually — they actually — their — their conduct was — there was a — as pled in the Complaint, there was a stipulation, we're going to give you the records of Lakefront. And the Complaint doesn't just say, oh, there's probably records they should have give [sic]. The Complaint actually specifies which records they didn't give.

. . . .

THE COURT: All right. Let me ask you a question. In litigation, there's a stipulation to turn over records. The other side doesn't turn over records. You're contending that's a fraud?

MR. MURRAY: Well, it is because they represented that these were the records of Lakefront, and they weren't.

. . . .

THE COURT: Not bank fraud, you're contending? It's clearly not bank fraud, what you're describing.

MR. MURRAY: It's — it's not — it's not — it's not bank fraud to — well —

THE COURT: It's got to be either bank fraud, mail fraud, or wire fraud.

MR. MURRAY: Except — except — except the Complaint makes it clear why they didn't turn over the records, because it would have shown the wire fraud, and it would have shown the bank fraud. That's why they didn't turn it over, and that's pled in the Complaint.

. . . .

THE COURT: [Y]ou have to be injured by the predicate acts. The predicate acts are mail fraud and wire fraud. Where's the mailing, where's the wires with respect to withholding documents in litigation?

. . . .

THE COURT: What I'm asking is this. I mean, if I have documents that I'm holding, I never sent them to you. How did I commit a mailing or a wiring?

MR. MURRAY: Well — well, you — well, except there —there — there were documents that they did give to him every year. And let — let me put it this way. One of the things that happens — or one of the things that happened with Lakefront is that every year there was a particular form prepared by WeiserMazars and its predecessor, Fishbein, and it's called a K-1. And the K-1 is what you attach to your own tax return. They're giving — and it's pled in the Complaint.

They're giving Mr. Irish false K-1s that he's attaching to his tax return, he's sending to the IRS.

(Mot. Hr'g Tr. 155:11–160:15.)

During this exchange, Plaintiffs' counsel was unable to articulate how Carversville Defendants' actions in withholding records from Irish constituted mail fraud or wire fraud. He then moved on to the issue of the false Schedule K-1 forms provided to Irish. The Court inquired:

> THE COURT: All right. Now, let's assume [the false Schedule K-1 forms] showed a loss to [Irish] that he was not entitled to. Right?
>
> MR. MURRAY: Correct.
>
> THE COURT: All right. He certainly would — it's certainly a fraud on the Internal Revenue Service, because on his tax return he'll take a deduction he's not entitled to, correct?
>
> MR. MURRAY: Correct.
>
> THE COURT: How is — how is it a fraud on him? That's what I'm trying to understand.
>
> MR. MURRAY: To the extent that — I — I — I can't — I can't — I can't —
>
> THE COURT: What's he been — let's put it this way. Mail fraud and wire fraud, it's a scheme. You need a mailing, a wiring in furtherance of a — of a scheme to defraud somebody, to deprive somebody of property or money or something. What has he been deprived of?
>
> MR. MURRAY: Well, I don't know — I don't — I don't know you can put it in dollars and cents. What he's entitled to . . . . is an accurate K-1.
>
> THE COURT: Is this some kind of an intangible right that he has under the mail fraud statute?
>
> MR. MURRAY: Well — well, if — if he's going — if he's going to complete his tax return and do it accurately, yes. . . .
>
> . . . .
>
> THE COURT: All right. What else? What happened afterwards that you contend is a fraud on [Irish]?

MR. MURRAY: I — I — I — I think I'm —I think I'm done with the fraud part, but I'm not — I'm not done with the harm part, but I think I'm done with the fraud part.

(Mot. Hr'g Tr. 162:2–163:25.) Plaintiffs' counsel admitted that the false Schedule K-1 forms did not involve the use of wires:

THE COURT: Now, where is the interstate wires in this scenario [involving the false Schedule K-1 forms]?

MR. MURRAY: I'm — I'm not — I'm not seeing the — I'm not seeing the — I'm not seeing the — I'm not seeing the interstate wires there. I — I might be missing something, but I — I'm not seeing them.

(Mot. Hr'g Tr. 166:20–167:1.) Thus, Plaintiffs' counsel conceded that no Defendant committed wire fraud as a racketeering predicate in this case.

Only a few paragraphs in the Complaint refer to the Schedule K-1 forms. They are as follows:

The underreporting of income and profit [by Lakefront] has resulted in inaccurate tax returns.[48]

. . . .

On December 20, 2008, Irish wrote to [Lakefront], to the specific attention of Defendant Vehstedt, the bookkeeper of [Lakefront], regarding the K-1 provided to Irish from [Lakefront].

Irish did not receive the documents requested in his letter of December 20th. The Defendant Vehstedt responded to Irish's December 20th letter by an email dated December 23, 2008.

Vehstedt's December 23rd email advised Irish that his questions regarding the 2007 K-1 should be addressed to Fishbein and Company, P.C., and that, at the instruction of Bugaj, "any and all concerns regarding any aspect to [sic] Lakefront Development Co, LLC" were to be directed to Bugaj. The conduct of Vehstedt

---

[48] This allegation does not specifically reference the "Schedule K-1." It could refer to Lakefront's inaccurate tax returns, or some other unrelated tax return. Reading the allegations in the light most favorable to Plaintiffs, the Court will consider it as referring to the alleged scheme involving false Schedule K-1 forms.

was at the instruction of Bugaj, Ferguson and Waldman who sought to hide the conduct of the Carversville Defendants from the Plaintiff Irish.

. . . .

By a letter dated July 7, 2009, Rydzewski notified Bugaj of the need for a full accounting; and of the doubtful legality of the alleged loss of $370,217.60 on the 2007 K-1.

(Doc. No. 1 at 19, 28, 33.) None of these allegations establish that Carversville Defendants or Accounting Defendants committed predicate acts of mail fraud against Plaintiffs in regard to the Schedule K-1 forms.

First, these allegations only involve Irish, not MIK. Second, the Complaint does not describe a scheme to defraud Irish with regard to the Schedule K-1 forms. Third, the Complaint does not allege that the United States mails were used in furtherance of the fraudulent scheme. See Hannigan, 27 F.3d at 892. Fourth, the Complaint only references a single Schedule K-1 form — the 2007 form. A single predicate act is insufficient to establish RICO liability — there must be two or more predicate acts. 18 U.S.C. § 1961(5).

Plaintiffs' counsel explained at the hearing that Accounting Defendants prepared the false Schedule K-1 forms and sent them to Irish using the mail. (Mot. Hr'g Tr. 160:4–15; 161:7–9.) Counsel also stated that Irish received Schedule K-1 forms for eight tax years — 2002 to 2009. (Mot. Hr'g Tr. 165:6–12.) The Court will infer that this statement is an allegation that Defendants used the mails to send Schedule K-1 forms on eight occasions. Counsel did not clarify, however, whether all eight years of Schedule K-1s were false or part of a scheme to defraud, or only the 2007 Schedule K-1. Additionally, the RICO Case Statement alleges:

The Accounting Defendants had actual knowledge that the K-1's which they prepared for Lakefront to be distributed to its five members, including Irish, were being used to deceive Irish; for example, while Irish was being provided with K-1's which included representations of yearly losses, and was being asked to loan monies to Lakefront on the misrepresentation that it could not cover its operating expenses, Ferguson, Waldman, Black and Woldow were plundering Lakefront.

(Doc. No. 58 at 6–7.)

Even if these additional allegations were added to the Complaint, it still would not establish mail fraud. Even if Accounting Defendants conspired with Carversville Defendants to falsify the 2007 Schedule K-1 and a Schedule K-1 for at least one additional tax year, Irish fails to "state with particularity the circumstances constituting fraud. . . ." Fed. R. Civ. P. 9(b).

Irish has not described the alleged fraudulent scheme. He has not given details about how mailing the purportedly false Schedule K-1 forms induced him to take actions that injured him or whether he even lent additional monies to Lakefront apart from his original investment of $15,000.[49] The RICO case statement, as noted above, merely states he was asked to loan monies to Lakefront based on the alleged misrepresentations in the Schedule K-1 forms. He has not explained how he was personally deprived of any money, property, or anything of value because of Defendants' actions. See McNally, 483 U.S. at 358 ("As the Court long ago stated . . . the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" (quoting Hammerschmidt, 265 U.S. at 188 (1924)).

Accordingly, the conclusory allegation in the Complaint that Accounting Defendants in complicity with the Carversville Defendants mailed the false Schedule K-1 forms to Irish as part

---

[49] The $15,000 deposit is the only money the Complaint alleges Irish was required to deposit into Lakefront. Irish does not allege he was fraudulently induced to invest the $15,000, and the RICO case statement does not make any mention of the $15,000 payment. The Complaint asserts that "Irish and the other members [of Lakefront] were required to deposit the amount of $15,000 into the operating account of [Lakefront]." (Doc. No. 1 at 10–11.) Irish contends that he is the only member who complied with this requirement, but the failure of the other members to make the payment does not raise an inference of mail fraud. There is no allegation in the extensive Complaint that he was misled into making the $15,000 deposit. Moreover, because the $15,000 payment was made "at the time of the creation of [Lakefront]" (id.), it was made even before Irish received the first Schedule K-1 form reporting his share of Lakefront's income or possibly losses. As noted, the Complaint does not allege that a loss was reported on the 2002 Schedule K-1. Consequently, no Schedule K-1 form could have induced him to pay the $15,000.

of a scheme or artifice to defraud him does not "permit the court to infer more than the mere possibility of misconduct.'" Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). This is insufficient to support a claim of a predicate act or the RICO claims set forth in the Complaint.

### 4.    All RICO Counts Will Be Dismissed

As discussed supra, Plaintiffs have failed to establish a substantive RICO violation under 18 U.S.C. § 1962(a)–(c) against any Defendant. The allegations in the first eighteen counts pertain to either: (1) frauds on Lakefront, ESSA, Blue Cross, or the IRS; (2) matters related to the termination of the Re/Max franchise; or (3) the allegedly false Schedule K-1 forms. Plaintiffs do not have standing to bring any RICO claim for alleged frauds on Lakefront, ESSA, Blue Cross, or the IRS. Moreover, Plaintiffs are collaterally estopped from litigating any matters related to the termination of the Re/Max franchise. The only activity Plaintiffs may have standing to raise is in regard to the purportedly false Schedule K-1 forms. The allegations with respect to the Schedule K-1 forms only involve the Carversville Defendants and Accounting Defendants, and do not amount to mail fraud. The absence here of a predicate act, and concomitantly the absence of a pattern of racketeering activity, undermines the sufficiency of any claim that Defendants committed RICO violations. For these reasons, all substantive RICO claims (Counts One, Two, Three, Five, Seven, Nine, Eleven, Thirteen, Fifteen, and Seventeen) will be dismissed.

"Any claim under section 1962(d) based on a conspiracy to violate [any of] the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." Lightning Lube, Inc., 4 F.3d at 1191 (citing Leonard v. Shearson Lehman/Am. Express, Inc., 687 F. Supp. 177, 182 (3d Cir. 1988)). "A conspiracy claim under section 1962(d) may survive a factfinder's conclusion that there is insufficient evidence to prove a RICO violation . . . but if the pleadings do not state a substantive RICO claim upon which relief may be

granted, then the conspiracy claim also fails." <u>Kolar v. Preferred Real Estate Invs., Inc.</u>, 361 F. App'x 354, 367 (3d Cir. 2010) (quoting <u>Efron v. Embassy Suites (Puerto Rico), Inc.</u>, 223 F.3d 12, 21 (1st Cir. 2000)).

Because the Complaint fails to set forth a claim under 18 U.S.C. § 1962(a)–(c) upon which relief may be granted, Plaintiffs' RICO conspiracy claims under § 1962(d) also fail as a matter of law. Accordingly, Plaintiffs remaining RICO claims (Counts Four, Six, Eight, Ten, Twelve, Fourteen, Sixteen, and Eighteen) will also be dismissed.

## C. Plaintiffs Have Not Stated a Claim under the Sherman Act for Which Relief May Be Granted

In the Complaint, Plaintiffs allege certain Defendants conspired to prevent them from competing in the local real estate market, and other Defendants established an illegal boycott of Plaintiffs' real estate listings, both in violation of the Sherman Act. Under the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Because Plaintiffs' antitrust claims fail to state a claim upon which relief may be granted, they will be dismissed.

### 1. Count Nineteen: Plaintiffs Lack Antitrust Standing Because They Have Not Established an Antitrust Injury

In Count Nineteen, Plaintiffs allege that Carversville Defendants, Weichert Defendants, Meagher Defendants, and Anderson Defendants ("Count Nineteen Defendants") each violated Section 1 of the Sherman Act by "conspir[ing], act[ing], and enter[ing]" into an agreement to:

a) Prevent Irish and MIK from doing business as a ReMax real estate business at the Irish Office Building.

b) Place a ReMax real estate business immediately next door to the building in which Irish and ReMax had been building up the ReMax name since 2001 (and in the immediate geographical area since 1998), while at the same time excluding Irish and MIK from operating a ReMax business in the Irish Office Building where the ReMax name had been operating since 2001 and had been made dominant by Irish and MIK.

c) Render Irish and MIK unable to compete in the real estate market.

d) Render MIK unable to pay rent to Irish for the use of the Irish Office Building.

(Doc. No. 1 at 80–81.) To prevail on a § 1 conspiracy claim, a plaintiff must prove that: 1) there was an agreement; 2) the agreement unreasonably restrained trade; and 3) the restraint caused an antitrust injury. W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 99–101 (3d Cir. 2010).

> Most restraints are analyzed under a legal precept known as the "rule of reason." The rule of reason requires the fact-finder to "weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." The plaintiff bears an initial burden under the rule of reason to show that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets.

United States v. Brown Univ. in Providence in State of R.I., 5 F.3d 658, 668 (3d Cir. 1993) (quoting Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977)) (internal citations omitted).

An antitrust injury is a prerequisite for antitrust standing. SignaPharm, Inc. v. Mut. Pharm. Co., 454 F. App'x 64, 68 (3d Cir. 2011), cert. denied, 133 S. Ct. 110 (2012). "Mere injury resulting from conduct that violated the antitrust laws is insufficient to confer antitrust standing." Id. at 68. Instead, to successfully allege an antitrust injury, a plaintiff must demonstrate: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3d Cir. 2010).

"[T]he class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market . . . and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends . . . ." W. Penn

<u>Allegheny Health Sys., Inc.</u>, 627 F.3d at 102 (internal citations omitted). "The antitrust-injury

requirement helps ensure 'that the harm claimed by the plaintiff corresponds to the rationale for

finding a violation of the antitrust laws in the first place, and it prevents losses that stem from

competition from supporting suits by private plaintiffs for . . . damages.'" <u>Id.</u> at 101 (quoting

<u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 342 (1990)). Thus, if a business suffers

losses due to competition, rather than anticompetitive acts, it has not suffered an antitrust injury.

<u>See</u> <u>ZF Meritor, LLC v. Eaton Corp</u>, 696 F.3d 254, 344 (3d Cir. 2012), <u>cert. denied</u>, 133 S. Ct.

2025 (2013) (quoting <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 477, 458 (1993) ("[t]he

Sherman Act 'directs itself not against conduct which is competitive, even severely so, but

against conduct which unfairly tends to destroy competition itself'")).

> **a.** **The Attempted Transfer and Cancelation of the Re/Max Franchise Did Not Have a "Competition-Reducing" Effect on the Marketplace**

As discussed <u>supra</u>, the Court of Common Pleas of Pike County held that Plaintiffs were

not owners of the Re/Max Franchise after February 1, 2005. Therefore, Plaintiffs were merely

employees or independent contractors of the Re/Max Franchise until Re/Max canceled the

franchise license on August 31, 2010. The harm Plaintiffs suffered, if any, from cancellation of

the franchise, was not an antitrust injury because Plaintiffs had other options available to them to

operate in the real estate marketplace.

In <u>West Penn Allegheny Health System</u>, the defendant chose not to refinance a loan to the

plaintiff in order to harm the plaintiff's business and boost the business of the plaintiff's

competitor. The loan agreement, however, permitted the plaintiff to obtain financing elsewhere

and to repay the loan early without penalty. <u>Id.</u> In view of these provisions, the Third Circuit

held that even if the defendant "acted with anticompetitive motives," the defendant's refusal to

refinance the loan when other refinancing options were available "could not have been

'competition-<u>reducing</u> aspect[s] . . . of the' conspiracy . . . and thus did not give rise to an antitrust injury." <u>Id.</u> at 103 (quoting <u>Atl. Richfield</u>, 495 U.S. at 344) (internal citation omitted) (emphasis and alteration in original); <u>see</u> <u>Christofferson Dairy, Inc. v. MMM Sales, Inc.</u>, 849 F.2d 1168, 1173–74 (9th Cir. 1988) (defendant's refusal to sell plaintiff surplus milk did not give rise to antitrust injury where "there were 'plenty' of other sources for surplus milk").

Similarly here, even if Count Nineteen Defendants conspired to transfer the Re/Max Franchise to Plaintiffs' competitor with the anticompetitive motive of harming Plaintiffs' business, this agreement could not be a "competition-reducing" aspect of the conspiracy. <u>See</u> <u>Atl. Richfield</u>, 495 U.S. at 344. Plaintiffs do not contend that the specific Re/Max Franchise in question was the only option available to them to conduct business under a franchise in the local marketplace, or that Plaintiffs had sought employment at other real estate businesses but were turned away. Thus, the acts of Count Nineteen Defendants would not prevent Plaintiffs from continuing to engage in the real estate business and continuing to compete in the marketplace.[50]

> **b.      Weichert Defendants and Meagher Defendants Do Not Have Market Power**

The Complaint alleges that Weichert Defendants and Meagher Defendants had "market power" (Doc. No. 1 at 81–82), and "[t]he concerted action by the Count Nineteen Defendants was for the purpose of reducing competition within the Pike-Wayne real estate sales market" (<u>id.</u> at 82). These bare allegations alone, however, are insufficient to establish an antitrust injury.

Under the "rule of reason," an allegation of "market power" can establish a facially anticompetitive restraint on trade. <u>See</u> <u>Gordon v. Lewistown Hosp.</u>, 423 F.3d 184, 210 (3d Cir.

---

[50] It is also questionable whether a non-owner operating under a franchise has suffered an antitrust injury based upon a decision by the franchisee either to transfer the franchise to another party, or to terminate the franchise.

2005). "Market power, the ability to raise prices above those that would otherwise prevail in a competitive market, is essentially a surrogate for detrimental effects [on the marketplace]." Id.

In considering whether market power suppresses or even destroys competition, the Third Circuit in Gordon noted with approval the following language from Board of Trade of the City of Chicago v. United States, 246 U.S. 231 (1918):

> To determine that question, the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

Gordon, 423 F.3d at 184 (quoting Board of Trade of the City of Chicago, 246 U.S. at 238–39). Here, it is evident that the alleged market share of Weichert Defendants and Meagher Defendants falls short of meeting the minimum requirements of "market power."

The restraint identified here by Plaintiffs is an effort by specific Defendants to put him out of business as a real estate broker in the Wayne County and Pike County, Pennsylvania real estate market. Before the alleged restraint, the Complaint alleges Plaintiffs' market share was 17.36%. (Doc. No. 1 at 81.) The Complaint alleges Weichert Defendants' market share was 10.84%, and Meagher Defendants' market share was 6.01% for their Re/Max BEST franchise and 10.42% for their Re/Max WAYNE franchise, for a total of 27.27%.[51] The U.S. Supreme Court has held, however, that a 30% share of the market is insufficient evidence of a dominant market position. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 7–8, 27 (1984), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006). In

---

[51] The Complaint does not cite the source of these figures, but the Court accepts them as being true on a Motion to Dismiss.

<u>Gordon</u>, the Third Circuit held 39% share was insufficient to prove market power. 423 F.3d at 213.

None of these Defendants had a market share sufficient to cause prices to rise or deprive Plaintiffs of the opportunity to pursue the real estate business in the marketplace identified by them. Weichert Defendants and Meagher Defendants' alleged 27.27% combined market share leaves 72.73% of the market open to other competitors. The percentage of market share of these Defendants is insufficient to prove "market power." Plaintiffs' allegation about "market power" of Defendants does not establish an antitrust injury.

      **c.**      **Plaintiffs Have Not Established an Antitrust Injury Because They Only Allege Harm to Themselves, Not To Market Competition**

Furthermore, "[t]he antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488 (1977) (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 320 (1962)). "[T]o establish an 'antitrust injury,' a plaintiff must plead specific facts showing that 'the challenged action has had an actual adverse effect on competition as a whole in the relevant market,' not just on plaintiff as a competitor." <u>Doron Precision Sys., Inc. v. FAAC, Inc.</u>, 423 F. Supp. 2d 173, 180 (S.D.N.Y. 2006) (quoting <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 543 (2d Cir. 1993)).

"[A]n individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." <u>Eichorn v. AT & T Corp.</u>, 248 F.3d 131, 140 (3d Cir. 2001). "[S]ection one claimants must plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market." <u>Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n</u>, 884 F.2d 504, 508 (9th Cir. 1989).

The Complaint alleges primarily a vendetta against Plaintiffs, but not a harm to competition at large. For instance, the Complaint asserts:

- The objective of Carversville Defendants and Meagher Defendants' alleged plan to sell the Re/Max Franchise for far less than its market value was to "create a buyer/transferee of the ReMax Franchise, or sham buyer/transferee, who would cause the most harm to Irish and MIK and cause the most benefit to Carversville Defendants." (Id. at 43.)

- "Tim Meagher intended to not only obtain a ReMax franchise next door to the Irish Office Building, but also to insure [sic] that Irish would no longer be operating under the ReMax name." (Id. at 44.)

- "Weichert's interest and motive in assisting the Carversville Defendants and the Meagher Defendants was to eliminate Irish and MIK from the local real estate market . . . ." (Id.)

- "Weichert Defendants, with the participation of the Meagher Defendants, were attempting to put out of business a competitor that had dominated the local real estate market for more than ten (10) years." (Id. at 45.)

- "The Weichert Defendants, the Meagher Defendants and the Anderson Defendants previously pursued their interests separately, but combined within the conspiracy described herein to act as one for their common benefit, which was to destroy Irish and MIK as competitors and capitalize on the valuable ReMax name as built up by Irish and MIK." (Id. at 82.)

In Count Nineteen, the alleged objectives of the antitrust conspiracy, as previously noted, are set forth as follows:

a) Prevent Irish and MIK from doing business as a ReMax real estate business at the Irish Office Building.

b) Place a ReMax real estate business immediately next door to the building in which Irish and ReMax had been building up the ReMax name since 2001 (and in the immediate geographical area since 1998), while at the same time excluding Irish and MIK from operating a ReMax business in the Irish Office Building where the ReMax name had been operating since 2001 and had been made dominant by Irish and MIK.

c) Render Irish and MIK unable to compete in the real estate market.

d) Render MIK unable to pay rent to Irish for the use of the Irish Office Building.

(Id. at 80–81.)

Here, Plaintiffs only allege harm to themselves. The essence of the allegations in the Complaint is of a vendetta against Plaintiffs. The objectives of the conspiracy are all aimed at Plaintiffs, not at influencing a change in the competitive market as a whole. They have not presented "specific facts showing that 'the challenged action has had an actual adverse effect on competition as a whole in the relevant market . . . .'" Doron Precision Sys., 423 F. Supp. 2d at 180. Because the matters considered above do not show the Count Nineteen Defendants committed acts of restraint the Sherman Act was enacted to control or eliminate, Plaintiff did not suffer an antitrust injury. Consequently, Count Nineteen will be dismissed.

## 2. Count Twenty: Plaintiffs Have Not Alleged Anticompetitive Conduct

In Count Twenty, Plaintiffs allege that Weichert Defendants and Meagher Defendants, with the exception of Paul M. Meagher, Jr. and Matthew Meagher ("Count Twenty Defendants"), violated the Sherman Act under 15 U.S.C. § 1 by creating an illegal boycott. Plaintiffs allege that "[t]he boycotting was accomplished by a concerted and purposeful refusal to show consumers those real estate properties listed by MIK or Irish in the Pike-Wayne real estate market." (Doc. No. 1 at 84.) Plaintiffs essentially contend that Irish, as agent for sellers, would

list properties for sale and that the Count Twenty Defendants, as agents for potential buyers, would refuse to show their customers properties listed by Plaintiffs. Despite this claim, Count Twenty will be dismissed because the Complaint itself alleges facts that are contrary to the existence of a boycott, and in any event, fails to establish an antitrust injury.

### a. There is No Per Se Liability Because Defendants Named in Count Twenty Do Not Have Market Power

"Judicial experience has shown that some classes of restraints have redeeming competitive benefits so rarely that their condemnation does not require application of the full-fledged rule of reason. Paradigmatic examples are 'horizontal agreements among competitors to fix prices or to divide markets.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 316 (3d Cir. 2010) (quoting Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007)). "Group boycotts, or concerted refusals by traders to deal with other traders," can also be a per se violation of the antitrust laws. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959). Klor's involved a "horizontal" restraint on commerce — that is, "[r]estraint[] imposed by agreement between competitors" — rather than a "vertical" restraint, which is "imposed by agreement between firms at different levels of distribution . . . ." Bus. Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 730 (1988).

The U.S. Supreme Court has held that unless an antitrust defendant possesses market power, the conclusion of per se anticompetitive effects is not warranted. Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 296–97 (1985). Application of the per se rule to a horizontal boycott "require[s] proof either of a purpose to horizontally restrict price competition, or of the defendants' shared market power or control over a key resource or facility . . . ." William Holmes & Melissa Mangiaracina, Antitrust Law Handbook § 2:16 (2012).

The claim here is that Count Twenty Defendants boycotted listings of Plaintiffs, not that they attempted to fix prices or divide markets. Moreover, as discussed <u>supra</u>, Count Twenty Defendants did not have market power. Nor is there an allegation that County Twenty Defendants control "a key resource or facility." For these reasons, the alleged boycott does establish per se liability under the antitrust laws.

### b. Plaintiffs' Allegations in the Complaint Contradict Their Claims of an Illegal Boycott and Anticompetitive Conduct

Plaintiffs allege Count Twenty Defendants "refus[ed] to show to consumers . . . real estate properties listed by MIK or Irish . . . ." (Doc. No. 1 at 84.) The Complaint does not allege the timeframe for this alleged activity. Reading the allegations in the light most favorable to Plaintiffs, they contend that Count Twenty Defendants either instructed buyers of property not to purchase listings made by Plaintiffs, or simply did not show Plaintiffs' listings to buyers. The Complaint itself, however, contains allegations contradicting these claims. In regard to the Weichert Defendants, the Complaint alleges that they represented buyers in the purchase of properties listed by Plaintiffs.

The Complaint notes certain Defendants, including Tammy Lee Clause, Esquire, and the other Anderson Defendants, "conspired with others and sought to use the burdens of meritless litigation to harm the Plaintiffs MIK and Irish." (<u>Id.</u> at 55.) In one of these purportedly meritless lawsuits, real estate buyers Wieslaw and Helen Wszolkowski purchased a property listed by Plaintiffs and filed a suit against Plaintiffs and the seller of the property. (<u>Id.</u>) The Wszolkowskis' real estate agent for the purchase of the property listed by Plaintiffs was Weichert and Thomas McColligan. (<u>Id.</u>) The Complaint also references two other lawsuits in which Plaintiffs sued certain Count Twenty Defendants over commissions owed to them — one lawsuit

against Weichert, McColligan, and Karen Rice, and another against Weichert, McColligan, and Santos Rolon, an Anderson Defendant. (Id. at 58–59.)

In these instances, the allegations in the Complaint undermine any claim of an illegal boycott in violation of § 1 under the Sherman Act. Accordingly, Count Twenty will be dismissed.[52]

### D. The Court Will Decline to Exercise Supplemental Jurisdiction over the Pennsylvania Common Law Claims

This Court has subject-matter jurisdiction over the state law claims alleged in the Complaint based upon the federal causes of action brought under RICO and the Sherman Act (Counts One through Twenty). Because the Court is dismissing Counts One through Twenty, only state law claims remain. 28 U.S.C. § 1367(c)(3) provides: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." A district court has broad discretion to determine whether to continue hearing state law causes of action. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); Hotel Syracuse, Inc. v. Young, 805 F. Supp. 1073, 1086 (N.D.N.Y. 1992). "If federal claims are dismissed before trial . . . the state claims should be dismissed as well." Gibbs, 383 U.S. at 726.

The Court will decline to exercise supplemental jurisdiction here. Accordingly, Counts Twenty-One through Twenty-Four will also be dismissed.

## V. CONCLUSION

The attempt here to create a RICO case out of failed business ventures and conflicts with business partners was not the intent behind RICO. Although RICO is to be broadly construed,

---

[52] Even when the rule of reason is considered with respect to the claim of an illegal boycott, as discussed above, Plaintiffs have not met their initial burden of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant geographic market.

Congress included elements to restrict the use of RICO to situations in which persons operating in an organized structure, over a considerable period of time, are committing serious federal offenses. Business disputes that last many years do not fall within these elements. Plaintiffs in this case properly resorted to state court to seek relief for perceived business indiscretions by partners, and to date have not prevailed. They therefore filed suit in federal court. But Plaintiffs' attempt to accuse not only business partners, but other persons who had contact with their financial setbacks, of RICO and antitrust violations, must fail on this record.

All claims against all Defendants — Counts One through Twenty-Four — will be dismissed. An appropriate Order follows.

## APPENDIX I: DEFENDANTS BY GROUP

| Defendant Group Name | Defendants in Group |
|---|---|
| **"Owner Defendants"** | Harry F. Ferguson<br>William H. Black<br>William B. Waldman<br>Martin Woldow |
| **"Carversville Defendants"** | "Owner Defendants"<br>(Ferguson, Black, Waldman,<br>Woldow)<br>Ronald M. Bugaj<br>Christine M. Vehstedt<br>Carversville Development<br>Company, LLC<br>Carversville Group, LLC |
| **"Accounting Defendants"** | WeiserMazars, LLP<br>Alan Cohen<br>Benjamin Fishbein |
| **"ESSA Defendants"** | ESSA Bank and Trust Company<br>William Lewis |
| **"Meagher Defendants"** | Meagher Realty Group, LLC<br>Meagher Associates, Inc.<br>Tim Meagher<br>Heather Meagher<br>Paul M. Meagher, Sr.<br>Paul M. Meagher, Jr.<br>Matthew Meagher |
| **"Anderson Defendants"** | G. Anderson Homes, Inc.<br>Grace Anderson<br>Santos Rolon<br>Tammy Lee Clause |
| **"Weichert Defendants"** | Weichert Realtors/Paupack<br>Group, Inc.<br>Thomas McColligan<br>Judith Rodonski<br>Debbi Friese<br>Karen Rice |
| **Ungrouped Defendants** | Re/Max, LLC<br>Waldman and Black GP<br>Bugaj and Fischer, P.C. |

## APPENDIX II: DEFENDANTS BY COUNT

| Count/Claim (Alleged by Plaintiffs George Irish and MIK, Inc., except where noted) | Defendant(s) |
|---|---|
| **Count One** (RICO: 18 U.S.C. § 1962(a)) | Harry F. Ferguson<br>William H. Black<br>William B. Waldman<br>Martin Woldow<br>Ronald M. Bugaj<br>Christine M. Vehstedt<br>Carversville Development Company, LLC<br>Carversville Group, LLC |
| **Count Two** (RICO: 18 U.S.C. § 1962(b)) | Harry F. Ferguson<br>William H. Black<br>William B. Waldman<br>Martin Woldow<br>Ronald M. Bugaj<br>Christine M. Vehstedt<br>Carversville Development Company, LLC<br>Carversville Group, LLC |
| **Counts Three, Five, Seven, Nine, Eleven, Thirteen, Fifteen, Seventeen** (RICO: 18 U.S.C. § 1962(c)) | **COUNT THREE**<br>Harry F. Ferguson<br>William H. Black<br>William B. Waldman<br>Martin Woldow<br>Ronald M. Bugaj<br>Christine M. Vehstedt<br>Carversville Development Company, LLC<br>Carversville Group, LLC<br>**COUNT FIVE**<br>WeiserMazars, LLP<br>Alan Cohen<br>Benjamin Fishbein<br>**COUNT SEVEN**<br>Re/Max, LLC<br>**COUNT NINE**<br>ESSA Bank and Trust Company<br>**COUNT ELEVEN**<br>William Lewis<br>**COUNT THIRTEEN**<br>Meagher Realty Group, LLC |

| | Meagher Associates, Inc. |
|---|---|
| | Tim Meagher |
| | Heather Meagher |
| | Paul M. Meagher, Sr. |
| | Paul M. Meagher, Jr. |
| | Matthew Meagher |
| | **COUNT FIFTEEN** |
| | G. Anderson Homes, Inc. |
| | Grace Anderson |
| | Santos Rolon |
| | Tammy Lee Clause |
| | **COUNT SEVENTEEN** |
| | Weichert Realtors/Paupack Group, Inc. |
| | Thomas McColligan |
| | Judith Rodonski |
| | Deborah Friese |
| | Karen Rice |
| | **COUNT FOUR** |
| | Harry F. Ferguson |
| | William H. Black |
| | William B. Waldman |
| | Martin Woldow |
| | Ronald M. Bugaj |
| | Christine M. Vehstedt |
| | Carversville Development Company, LLC |
| | Carversville Group, LLC |
| | **COUNT SIX** |
| | WeiserMazars, LLP |
| **Counts Four, Six, Eight, Ten, Twelve, Fourteen, Sixteen, Eighteen** (RICO: 18 U.S.C. § 1962(d)) | Alan Cohen |
| | Benjamin Fishbein |
| | **COUNT EIGHT** |
| | Re/Max, LLC |
| | **COUNT TEN** |
| | ESSA Bank and Trust Company |
| | **COUNT TWELVE** |
| | William Lewis |
| | **COUNT FOURTEEN** |
| | Meagher Realty Group, LLC |
| | Meagher Associates, Inc. |
| | Tim Meagher |
| | Heather Meagher |
| | Paul M. Meagher, Sr. |
| | Paul M. Meagher, Jr. |
| | Matthew Meagher |

| | |
|---|---|
| | **COUNT SIXTEEN** |
| | G. Anderson Homes, Inc. |
| | Grace Anderson |
| | Santos Rolon |
| | Tammy Lee Clause |
| | **COUNT EIGHTEEN** |
| | Weichert Realtors/Paupack Group, Inc. |
| | Thomas McColligan |
| | Judith Rodonski |
| | Deborah Friese |
| | Karen Rice |
| **Count Nineteen** (Conspiracy to Violate Sherman Act: 15 U.S.C. § 1) | Harry J. Ferguson |
| | William G. Waldman |
| | William H. Black |
| | Waldman and Black GP |
| | Martin Woldow |
| | Christine M. Vehstedt |
| | Ronald M. Bugaj |
| | Bugaj and Fischer, P.C. |
| | Carversville Development Company, LLC |
| | Carversville Group, LLC |
| | Meagher Realty Group, LLC |
| | Meagher Associates, Inc. |
| | Tim Meagher |
| | Heather Meagher |
| | Paul M. Meagher, Sr. |
| | Paul M. Meagher, Jr. |
| | Matthew Meagher |
| | G. Anderson Homes, Inc. |
| | Grace Anderson |
| | Santos Rolon |
| | Tammy Lee Clause |
| | Weichert Realtors/Paupack Group, Inc. |
| | Thomas McColligan |
| | Judith Rodonski |
| | Deborah Friese |
| | Karen Rice |
| **Count Twenty** (Illegal Boycott in Violation of the Sherman Act: 15 U.S.C. § 1) | Weichert Realtors/Paupack Group, Inc. |
| | Thomas McColligan |
| | Judith Rodonski |
| | Deborah Friese |
| | Karen Rice |

| | |
|---|---|
| | Meagher Realty Group, LLC<br>Meagher Associates, Inc.<br>Tim Meagher<br>Heather Meagher<br>Paul M. Meagher, Sr. |
| **Count Twenty-One**<br>(PENNSYLVANIA STATE<br>LAW CLAIM: Breach of<br>Covenant of Good Faith and<br>Fair Dealing) | Harry J. Ferguson<br>William B. Waldman<br>William H. Black<br>Martin Woldow |
| **Count Twenty-Two**<br>(PENNSYLVANIA STATE<br>LAW CLAIM: Commercial<br>Disparagement) | Harry J. Ferguson<br>William G. Waldman<br>William H. Black<br>Waldman and Black GP<br>Martin Woldow<br>Christine M. Vehstedt<br>Ronald M. Bugaj<br>Bugaj and Fischer, P.C.<br>Carversville Development<br>Company, LLC<br>Carversville Group, LLC<br>Meagher Realty Group, LLC<br>Meagher Associates, Inc.<br>Tim Meagher<br>Heather Meagher<br>Paul M. Meagher, Sr.<br>Paul M. Meagher, Jr.<br>Matthew Meagher<br>G. Anderson Homes, Inc.<br>Grace Anderson<br>Santos Rolon<br>Tammy Lee Clause<br>Weichert Realtors/Paupack<br>Group, Inc.<br>Thomas McColligan<br>Judith Rodonski<br>Deborah Friese<br>Karen Rice |
| **Count Twenty-Three**<br>(PENNSYLVANIA STATE<br>LAW CLAIM: Civil<br>Conspiracy) | Harry J. Ferguson<br>William G. Waldman<br>William H. Black<br>Waldman and Black GP<br>Martin Woldow<br>Christine M. Vehstedt<br>Ronald M. Bugaj<br>Bugaj and Fischer, P.C. |

|  | Carversville Development Company, LLC |
|  | Carversville Group, LLC |
|  | Meagher Realty Group, LLC |
|  | Meagher Associates, Inc. |
|  | Tim Meagher |
|  | Heather Meagher |
|  | Paul M. Meagher, Sr. |
|  | Paul M. Meagher, Jr. |
|  | Matthew Meagher |
|  | G. Anderson Homes, Inc. |
|  | Grace Anderson |
|  | Santos Rolon |
|  | Tammy Lee Clause |
|  | Weichert Realtors/Paupack Group, Inc. |
|  | Thomas McColligan |
|  | Judith Rodonski |
|  | Deborah Friese |
|  | Karen Rice |
| **Count Twenty-Four** (PENNSYLVANIA STATE LAW CLAIM: Negligent Infliction of Emotion Distress) *Alleged by Sandra Irish ONLY* | Harry J. Ferguson |
|  | William G. Waldman |
|  | William H. Black |
|  | Waldman and Black GP |
|  | Martin Woldow |
|  | Christine M. Vehstedt |
|  | Ronald M. Bugaj |
|  | Bugaj and Fischer, P.C. |
|  | Carversville Development Company, LLC |
|  | Carversville Group, LLC |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GEORGE P. IRISH, et al.,

               Plaintiffs,

    v.

HARRY J. FERGUSON, et al.,

               Defendants.

CIVIL ACTION
NO. 12-0174

## ORDER

**AND NOW**, this 3rd day of September 2013, upon consideration of Defendants' Motions to Dismiss (Doc. Nos. 60, 62, 65, 66, 67, 68, 70, 71, 72, 75, 76, 77, and 102) and Memoranda of Law in Support of the Motions, Plaintiffs' Briefs in Opposition (Doc. Nos. 100, 101, 103, 105, 106, 107, 108, 109, 110, 111, 115, 134, and 135), Defendants' Replies in Further Support of the Motions (Doc. Nos. 126, 128, 129, 136, and 137), the arguments of counsel for the parties at the hearing held on November 6, 2012, Defendants' Supplemental Memoranda of Law in Further Support of the Motions (Doc. Nos. 146, 147, 148, 149, 150, 151, 152, 153, 154, 157, 158, and 159), Plaintiffs' Supplemental Briefs in Further Opposition (Doc. Nos. 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, and 173), and Defendants' Replies in Further Support of the Motions (Doc. Nos. 174, 175, 176, 177, and 178), and in accordance with the Opinion of the Court issued this day, it is **ORDERED** as follows:

1.    Defendants' Motions to Dismiss (Doc. Nos. 60, 62, 65, 66, 67, 68, 70, 71, 72, 75, 76, 77, and 102) are **GRANTED**.

2. Defendants William H. Black, Carversville Development Company, LLC, Carversville Group, LLC, Harry J. Ferguson, William G. Waldman, and Waldman and Black, a Partnership's Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11 (Doc. No. 133) is **DENIED**.[1]

3. Any outstanding motions are **DENIED AS MOOT**.

4. The Clerk of Court shall close this case.

BY THE COURT:

JOEL H. SLOMSKY, J.

---

[1] The Court has reviewed the Motion for Sanctions and has concluded that sanctions are not warranted here.